# UNITED STATED DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

POWERMAT TECHNOLOGIES, LTD.,

        Plaintiff,

    v.

BELKIN INTERNATIONAL, INC.,

        Defendant.

Case No. 1:19-cv-878-VSB

**DEFENDANT BELKIN INTERNATIONAL, INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT
ON THE PLEADING AND IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 4

LEGAL STANDARD...................................................................................................... 5

ARGUMENT ................................................................................................................. 6

    I.     Belkin's Reformation Claim Cannot Be Dismissed on the Pleadings. ................. 6

          A.     Belkin Has Pleaded Mutual Mistake with Particularity ............................ 6

          B.     Powermat Misstates New York Law In Asking the Court to Ignore the Parties' Course of Performance and Other Evidence of Mutual Mistake .................................................................................................... 8

          C.     If Belkin's Reformation Claim Lacks Sufficient Particularity, Belkin Should Be Granted Leave to Replead. ......................................... 11

    II.    The License Agreement Is Ambiguous as to Whether Qi-Only Receivers and Transmitters Are Subject To Royalties. ......................................................... 12

          A.     The Scope of Belkin's Technology License Strongly Suggests that the License Agreement Was Not Intended to Cover Qi-Only Devices.................................................................................................... 14

          B.     The Definition of Licensed Chipset Conflicts with the Definitions of Licensed Receivers and Transmitters. ................................................. 15

    III.   Powermat Ignores Belkin's Other Defenses to Liability, Which Cannot Be Dismissed on the Pleadings. ................................................................................... 18

    IV.   The Court Should Grant Belkin's Cross-Motion and Enforce the Limitation-of-Liability Provision Against Powermat. ......................................... 19

CONCLUSION............................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alghadeer Bakery & Mkt., Inc. v. Worldpay US, Inc.*,
2018 WL 5016496 (N.D. Ga. Oct. 16, 2018) ........................................................ 22

*Aluminum Co. of Am. v. Toba Adjustments, Inc.,*
1998 WL 120355 (S.D.N.Y. Mar. 18, 1998) ........................................................ 6

*Barash v. Pa. Terminal Real Estate Corp.*,
26 N.Y.2d 77 (1970) ........................................................................................... 9

*Brandwein v. Provident Mutual Life Insurance Co.*,
3 N.Y.2d 491 (1957) .............................................................................. 1, 8, 9, 11

*Caisse Nationale De Credit Agricole-CNCA, New York Branch v. Valcorp, Inc.*,
1992 WL 245500 (S.D.N.Y. Sept. 17, 1992) ..................................................... 11

*Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*,
797 F. Supp. 2d 254 (S.D.N.Y. 2011) ("*Citibank I*"), *aff'd*, 482 F. *App'x* 662 (2d Cir. 2012),
*as amended* (Oct. 25, 2012) ("*Citibank II*") ............................................. passim

*Conn. Indemn. Co. v. QBC Trucking, Inc.*,
2005 WL 1427424 (S.D.N.Y. June 20, 2005) ................................................... 19

*Croce v. Kurnit*,
737 F.2d 229 (2d Cir. 1984) ............................................................................... 8

*Electron Trading LLC v. Morgan Stanley & Co. LLC*,
2017 WL 1479483 (N.Y. Sup. Ct. Apr. 25, 2017)...................................... 21, 23

*Evans v. Famous Music Corp.*,
807 N.E.2d 869 (N.Y. Ct. App. 2004) .............................................................. 13

*Five Star Dev. Resort Cmtys. v. iStar RC Paradise Valley*,
2012 WL 4119561 (S.D.N.Y. Sept. 18, 2012)................................................... 22

*GE Funding Capital Market Servs., Inc. v. Nebraska Inv. Finance Auth.*,
2016 WL 4784002 (S.D.N.Y. Sept. 14, 2016).................................................... 5

*Gioconda Law Group PLLC v. Kenzie*,
941 F. Supp. 2d 424 (S.D.N.Y. 2013) ................................................................ 5

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008) .............................................................. 11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*K.G. Cornwall, LLC v. Beazer Homes Corp.*,
　2008 WL 563466 (S.D.N.Y. Feb. 28, 2008)............................................................. 10

*Katel Ltd. Liab. Co. v. AT & T Corp.*,
　607 F.3d 60 (2d Cir. 2010) ..................................................................................... 16

*Landau v. New Horizon Partners, Inc.*,
　2003 WL 22097989 (S.D.N.Y. Sept. 8, 2003)......................................................... 19

*Life Product Clearing, LLC v. Angel*,
　530 F. Supp. 2d 646 (S.D.N.Y. 2008) ...................................................................... 6

*McEachin v. Northland Grp., Inc.*,
　2012 WL 6582423 (S.D.N.Y. Dec. 14, 2012) .......................................................... 10

*Media Glow Dig., LLC v. Panasonic Corp. of N. Am.*,
　2018 WL 2175550 (S.D.N.Y. May 11, 2018) ................................................... 20, 22

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
　84 N.Y.2d 430 (1994).............................................................................................. 22

*New York First Ave. CVS, Inc. v. Wellington Tower Assocs.*, L.P.,
　750 N.Y.S.2d 586 (1st Dep't 2002) ......................................................................... 9

*Pacs Indus. v. Cutler-Hammer, Inc.*,
　103 F. Supp. 2d 570 (E.D.N.Y. 2000) ............................................................... 20, 23

*Pit River Tribe v. Bureau of Land Mgmt.*,
　793 F.3d 1147 (9th Cir. 2015) ................................................................................. 18

*Playboy Enters. Inc. v. Dumas*,
　960 F. Supp. 710 (S.D.N.Y. 1997), *aff'd.,* 159 F.3d 1347 (2d Cir. 1998)................ 19

*Rothenberg v. Lincoln Farm Camp, Inc.*,
　755 F.2d 1017 (2d Cir. 1993) .................................................................................. 17

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
　7 F.3d 1091 (2d Cir. 1993) ................................................................................. 13, 17

*Scion 2040 Managing Member LLC v. EBREF Holding Co., LLC*,
　2011 WL 1457147 (E.D. Wis. Apr. 15, 2011).......................................................... 6

*Securitized Asset Funding, Ltd. v. Canadian Imperial Bank of Commerce*,
　90 N.Y.S.3d 27 (1st Dep't 2018) ............................................................................. 9

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Seiden Assoc. Inc. v. ANC Holdings, Inc.*,
   959 F.2d 425 (2d Cir. 1992) ................................................................. 13, 18

*Strum v. Bd. of Ed. of City of N.Y.*,
   76 N.Y.S.2d 681 (Sup. Ct. 1947), *aff'd*, 96 N.E.2d 192 (N.Y. Ct. App. 1950)....... 18

*Sure-Trip, Inc. v. Westinghouse Engineering*,
   47 F.3d 526 (2d Cir. 1995) ..................................................................... 13

*Thompson v. Gjivoje*,
   896 F.2d 716 (2d Cir. 1990) ................................................................... 13

*Tradex Europe SPRL v. Conair Corp.*,
   2008 WL 1990464 (S.D.N.Y. May 7, 2008) ..................................... 20, 21

*Vasquez v. Mullooly, Jeffrey, Rooney & Flynn LLP*,
   2017 WL 4402567 (S.D.N.Y. Sept. 30, 2017)........................................ 18

*VoiceAge Corp. v. RealNetworks, Inc.*,
   926 F. Supp. 2d 524 (S.D.N.Y. 2013) ................................................... 10

*Warberg Opportunistic Trading Fund L.P. v. GeoResources, Inc.*,
   58 N.Y.S.3d 1 (1st Dep't 2017)................................................................ 8

*William C. Atwater & Co. v. Panama R.R. Co.*,
   246 N.Y. 519, 159 N.E. 418 (1927)....................................................... 13

*Williams & Sons Erectors, Inc. v. South Carolina Steel Corp.*,
   983 F.2d 1176 (2d Cir. 1993) ................................................................. 13

**Rules**

Fed. R. Civ. P. 12(c) ...................................................................................... 5

Fed. R. Civ. P. 9(b) ...................................................................................... 11

**Treatises**

5 Williston on Contracts (rev. ed.), § 1552.................................................... 9

Defendant Belkin International, Inc. ("Belkin") respectfully submits this memorandum of law in opposition to Plaintiff Powermat Technologies, Ltd.'s ("Powermat") motion for partial judgment on the pleadings (ECF No. 38) ("Mot.") and in support of Belkin's cross-motion for partial judgment on the pleadings on the limitation-of-liability issue.

## INTRODUCTION

Powermat's motion is a flawed attempt to avoid discovery in a case rife with factual issues and extrinsic evidence contradicting Powermat's interpretation of the License Agreement. For starters, Belkin's reformation claim is fact-intensive and cannot be decided on the pleadings, particularly given the detailed allegations supporting it.  Belkin alleges that, among other things, the parties never discussed the possibility of Belkin paying royalties on Qi-only wireless charging devices; Powermat represented to Belkin that it was providing a license *only* for PMA-compliant devices; and Powermat never requested royalties on Qi-only wireless charging devices for 16 months after the License Agreement was executed, despite knowing that Belkin was selling those devices.  Powermat offers no explanation for this course of performance, which directly contradicts Powermat's current interpretation of the License Agreement and is the strongest evidence of Powermat's actual intent when entering the agreement.

Recognizing the implications of its own statements and conduct, Powermat argues that the Court must ignore this so-called "parol evidence" in light of the License Agreement's integration clause, which supersedes any prior oral agreement between the parties.  But that is a gross misstatement of New York law.  The Court of Appeals and other New York courts have repeatedly held that a general integration clause is no bar to considering extrinsic evidence of a mutual mistake.  *See Brandwein v. Provident Mutual Life Insurance Co.*, 3 N.Y.2d 491 (1957). That makes sense because, given the proliferation of integration clauses in modern contracts, accepting Powermat's argument would effectively abolish reformation as a viable cause of action

and preclude courts from correcting legitimate scrivener's errors.  Accordingly, the Court may

consider *all* of the allegations supporting Belkin's reformation claim, particularly Powermat's

course of performance, and should deny Powermat's motion on that basis alone.

Powermat's motion should also be denied because, even absent reformation, there are

factual issues regarding the intended scope of the License Agreement that cannot be resolved on

the pleadings.  Specifically, the License Agreement is ambiguous because it contains two

provisions that, while arguably unambiguous on their own, cannot be reconciled and make the

contract as a whole reasonably susceptible to Belkin's and Powermat's varying interpretations.

First, under Section 2.3 of the License Agreement, Powermat granted Belkin a license to

a broad bundle of rights, including all technology, trade secrets, and copyrights related to the

PMA standard.  Powermat, however, *did not* grant Belkin a similar license for any technology or

trade secrets related to Qi.  If the License Agreement had been intended to cover Qi-only

products, as Powermat now claims, this omission would be wholly illogical, contrary to industry

custom and practice, and lead to absurd results.  Namely, Powermat could sue Belkin for

unauthorized use of trade secrets and technology related to Qi, despite Belkin purportedly owing

Powermat royalties on Qi-only products.  That cannot possibly be what the parties intended.  The

lack of a technology license for Qi strongly suggests that the parties intended the License

Agreement to apply *only* to PMA products, regardless of any contrary language in the definitions

of Licensed Receiver and Licensed Transmitter.

Second, the definition of Licensed Chipset excludes Qi-only devices, in direct conflict

with the definitions of Licensed Receiver and Licensed Transmitter.  As the License Agreement

makes clear, the parties understood and agreed that Licensed Chipsets—which are the "brains"

of the wireless charging product and contain most of the relevant technology—would be used as

a component in Licensed Receivers and Licensed Transmitters.  The Court will therefore need to determine, based on extrinsic evidence, which of these competing definitions reflects the parties' actual intent when entering the contract.  As Belkin's allegations make clear, the parties plainly understood that the definition of Licensed Chipset would control and that the Agreement would cover only PMA-compliant devices, as demonstrated by Powermat's course of performance for 16 months after the agreement was executed.  That is more than sufficient to create a triable issue of fact and defeat Powermat's motion.

Moreover, even if the License Agreement were unambiguous, Powermat's motion would still fail because Belkin has pleaded affirmative defenses that would relieve it of liability—none of which Powermat has bothered to address.  Specifically, Belkin has asserted waiver, laches, estoppel, unclean hands, and lack of consideration defenses, all of which raise factual issues about Powermat's conduct during and after the License Agreement was executed.  By failing to address these defenses in its motion, Powermat has waived any argument that they do not apply and cannot attack them for the first time on reply, particularly given that Belkin will have no opportunity to respond.

In any event, the Court should grant Belkin's cross-motion and dismiss Powermat's claim for damages falling outside the 12-month period provided for in the License Agreement's limitation-of-liability provision.  That provision states that "each party's *total liability* under this agreement shall not exceed the total amount of fees paid by [Belkin] to Powermat over the twelve months immediately preceding the date for which the claim was made."  (License Agreement (ECF No. 39-1) § 13 (emphasis added).)  This language could not be clearer, and New York courts have repeatedly enforced virtually identical provisions.  Deciding this issue now would facilitate the resolution of this case by providing clarity on Powermat's potential

recovery, which, given the royalties generated over the 12 months preceding Belkin's alleged breach, would be only a few hundred thousand dollars, rather than the millions that Powermat seeks.  Such a ruling would also shape and inform any attempts to resolve this misguided dispute through mediation or other settlement efforts.

## BACKGROUND

Belkin is a manufacturer and seller of consumer electronic accessories, including wireless charging devices for smartphones and tablets.  On November 3, 2015, Belkin and Powermat entered into a License Agreement (the "Agreement") under which Belkin obtained a license to certain rights necessary to implement Powermat's wireless charging technology, known as the Power Matters Alliance ("PMA") standard.  (Answer (ECF No. 28) ¶ 63.)  In exchange, Belkin agreed to pay Powermat a royalty on each PMA-enabled wireless charging device that it sold, including devices employing both the PMA standard and the competing Qi standard, which was developed by a different industry group.  (Answer ¶ 63; License Agreement § 5.1.)  Belkin did not, however, agree to pay Powermat royalties on devices employing *only* the Qi standard. (Answer ¶ 63.)

Under the License Agreement, Belkin obtained (i) a license to use Powermat's proprietary PMA-related technology, trade secrets, and copyrights (License Agreement § 2.3); and (ii) a license to practice Powermat's patents (*Id.* § 2.1).  Notably, the License Agreement does not grant Belkin a license to use any proprietary Powermat technology or trade secrets related to the Qi standard.  Nor does the patent license cover Qi-only wireless charging chipsets. "Licensed Chipsets" are defined to include chipsets that implement elements of the PMA Specification or *both* the PMA Specification *and* the Qi Specification.  (*Id.*, Ex. A ¶ 4.)  The definitions of "Licensed Transmitter" and "Licensed Receiver," however, conflict with the definition of Licensed Chipset insofar as they include Qi-only devices.  (*Id.*, Ex. A ¶¶ 7–8.)

The License Agreement also contains a standard limitation-of-liability provision.  The first sentence of Section 5.3 provides that the parties cannot recover indirect or consequential damages arising from a claimed breach of the Agreement.  The second sentence, in turn, limits "each party's total liability" for direct damages to "the total amount of fees paid by Licensee to Powermat over the twelve months immediately preceding the date for which the claim was made."  (*Id*. § 13.)

For more than 16 months after the License Agreement was executed, Belkin paid Powermat quarterly royalties only on PMA-enabled wireless charging devices.  (Answer ¶ 66.)  At no point during that time did Powermat suggest that it was owed, or demand payment of, royalties on Qi-only wireless charging devices.  (*Id*.)  Powermat now contends, however, that notwithstanding its own course of performance and written statements to the contrary, the parties intended Belkin to owe such royalties under the License Agreement.

## LEGAL STANDARD

Parties seeking judgment on the pleadings under Federal Rule of Civil Procedure 12(c) bear a heavy burden.  Courts recognize that "because hasty or imprudent use of this summary procedure . . . violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense," judgment on the pleadings is inappropriate "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."  *Gioconda Law Group PLLC v. Kenzie,* 941 F. Supp. 2d 424, 427 (S.D.N.Y. 2013) (quotation marks omitted).  Under the Rule 12(c) analysis, courts must "accept[] as true all of the non-moving party's well-pleaded factual allegations and draw[] all reasonable inferences in favor of the non-moving party."  *GE Funding Capital Market Servs., Inc. v. Nebraska Inv. Finance Auth.*, 2016 WL 4784002, at *2 (S.D.N.Y. Sept. 14, 2016).  Thus, where a plaintiff moves for judgment on the pleadings, "the facts as alleged in [defendant's]

answer and counterclaims are assumed to be true." *Life Product Clearing, LLC v. Angel,* 530 F.
Supp. 2d 646, 648 (S.D.N.Y. 2008); *see also Aluminum Co. of Am. v. Toba Adjustments, Inc.,*
1998 WL 120355, at *1 (S.D.N.Y. Mar. 18, 1998) (denying plaintiff's motion for judgment on
pleadings where defendant's answer presented facts that would entitle defendant, not plaintiff, to
relief).

## ARGUMENT

### I.     Belkin's Reformation Claim Cannot Be Dismissed on the Pleadings.

#### A.     Belkin Has Pleaded Mutual Mistake with Particularity.

The Court need not wade into the details of the parties' competing interpretations of the
License Agreement at this early stage because Belkin has successfully pleaded a reformation
claim that is fact intensive and cannot be resolved on a Rule 12(c) motion.  *See Citibank, N.A. v.
Morgan Stanley & Co. Int'l, PLC*, 797 F. Supp. 2d 254, 264 (S.D.N.Y. 2011) ("*Citibank I*"),
*aff'd*, 482 F. *App'x* 662 (2d Cir. 2012), *as amended* (Oct. 25, 2012) ("*Citibank II*")
("Reformation of contract . . . is not a matter of resolving an ambiguity in a contract but rather of
supplying what the parties clearly intended to include but inadvertently omitted."); *Scion 2040
Managing Member LLC v. EBREF Holding Co., LLC*, 2011 WL 1457147, at *5 (E.D. Wis.
Apr. 15, 2011) ("Given the factually intensive nature of a reformation claim, such claims are
rarely resolved on motions to dismiss.").

While Powermat argues that "Belkin states no particularized facts supporting a plausible
inference of mutual mistake" (Mot. at 12), that is inaccurate.  Belkin alleges that it approached
Powermat for the sole purpose of licensing PMA technology and that in negotiating the License
Agreement the parties "never discussed even the possibility of Belkin paying royalties on
Qi-only devices." (Answer ¶ 64.)  To the contrary, Powermat told Belkin only weeks before
signing the License Agreement that "Powermat provides only a license for Powermat IP required

for implementing the PMA standard, *and nothing more* . . . Powermat provides only the ability to license the use of our patents as part of the implementation of your product *for meeting the PMA standard*." (*Id.*) This was reflected in the License Agreement's definition of Licensed Chipsets, which are the *central* component in wireless charging devices. The Agreement states that Licensed Chipsets "means a chipset (a) for wireless power or that is capable of enabling wireless power charging for either Licensed Receivers or Licensed Transmitters, (b) *that implements elements of the PMA Specification or both the PMA Specification and the Qi Specification*, and (c) which, once joined with other components, becomes a Licensed Receiver or Licensed Transmitter." (*Id.* ¶ 65 (emphasis added).) Notably, the definition of Licensed Chipsets does *not* include wireless charging chipsets that implement only the Qi Specification.[1]

The Agreement's intended scope was also confirmed by the parties' course of performance: "For more than *sixteen months* after the Agreement was executed, Belkin paid Powermat quarterly royalties *only* on PMA-enabled wireless charging devices," and "while it was public knowledge that Belkin was also selling Qi-only wireless charging devices, Powermat never suggested that it was owed royalties on those devices," let alone demanded payment. (Answer ¶ 66.) "Only in March 2017, after it became evident that Qi was going to eclipse PMA as the industry standard (much as VHS eclipsed Betamax), did Powermat change its interpretation of the Agreement and begin demanding royalties from Belkin on Qi-only devices." (*Id.*) These allegations are more than sufficient to support a plausible inference of mutual mistake under New York law because course-of-performance evidence "is considered to be the *most persuasive evidence* of the agreed intention of the parties." *Citibank II*, 797 F. Supp. 2d at

---

[1] While Powermat tries to explain away this omission with unsupported assertions in a footnote of its brief (Mot. at 10 n.2), that only confirms the existence of a factual dispute that cannot be decided on a Rule 12(c) motion.

265 (emphasis added); *Croce v. Kurnit*, 737 F.2d 229, 235 (2d Cir. 1984) ("parties' practical construction of the contract prior to the commencement of the litigation . . . is compelling" evidence of their actual intent); *Warberg Opportunistic Trading Fund L.P. v. GeoResources, Inc.*, 58 N.Y.S.3d 1, 6 (1st Dep't 2017) ("The parties' course of performance under the contract, or their practical interpretation of a contract for any considerable period of time, is the most persuasive evidence of the agreed intention of the parties."). Indeed, it defies logic that Powermat—which describes itself as a "large sophisticated business"—would have sat idly by for 16 months while Belkin failed to pay royalties on Qi-only products. If Powermat had truly believed that it was entitled to those royalties, it would have demanded payment long before the PMA standard became obsolete. But Powermat remained silent because that was never the intention or understanding of the parties.

### B.   Powermat Misstates New York Law In Asking the Court to Ignore the Parties' Course of Performance and Other Evidence of Mutual Mistake.

Recognizing that its own statements and conduct confirm that the License Agreement was never intended to cover Qi-only devices, Powermat argues that the Court should ignore this and other evidence of mutual mistake because the License Agreement contains an integration clause superseding any prior oral or written agreements. (*See* Mot. at 13.) According to Powermat, because mutual mistake requires a preexisting oral agreement, "it cannot coexist with a written statement of the parties' intent to supersede oral agreements." (*Id.* (citing Michigan law).) But Powermat relies on Michigan law because New York law is to the contrary.

New York courts have long recognized that a general integration clause—like that contained in the License Agreement—does not foreclose a reformation claim based on mutual mistake. *Brandwein*, 3 N.Y.2d 491, is directly on point. There, the defendant moved for judgment on the pleadings and argued that because the contract contained a general integration

clause, the parol evidence rule barred plaintiff from submitting evidence of a preexisting oral agreement to establish mutual mistake or fraud.  *Id.* at 495.  The Court of Appeals, however, rejected that argument, holding that "it is settled that neither the Statute of Frauds nor the parol evidence prohibition forbids reformation of a written contract to include material orally agreed upon but, because of mutual mistake or unilateral mistake plus fraud, not inserted in the writing. The authorities so holding are numerous and consistent."  *Id.* at 496 (*citing, e.g.*, 5 Williston on Contracts (rev. ed.), § 1552)).  The Court of Appeals later reached the same result in *Barash v. Pa. Terminal Real Estate Corp.*, 26 N.Y.2d 77 (1970), holding that "a general merger clause does not bar an action to reform a contract, which by reason of fraud and mistake does not contain the agreement of the parties."  *Id.* at 86.

That remains the law in New York today, which makes sense, of course, because integration clauses are a standard feature in modern contracts and a contrary rule would effectively abolish reformation as a viable cause of action.  *See, e.g.*, *Securitized Asset Funding, Ltd. v. Canadian Imperial Bank of Commerce*, 90 N.Y.S.3d 27, 29 (1st Dep't 2018) ("The fact that the A Note and B Certificate contain merger/integration and no-waiver clauses does not foreclose CIBC's reformation counterclaim."); *New York First Ave. CVS, Inc. v. Wellington Tower Assocs.*, L.P., 750 N.Y.S.2d 586, 587 (1st Dep't 2002) ("extrinsic evidence is admissible in a reformation action even if there is no ambiguity in the contract, and a general merger clause does not bar an action to reform a contract" (citations omitted)); *Citibank I*, 724 F. Supp. 2d at 417 (same).

The authorities cited by Powermat do not say otherwise.  Powermat relies on *Citibank II*, for example, but the court there had earlier *declined to dismiss a reformation claim* based on allegations of mutual mistake—*despite the presence of an integration clause*.  *Citibank I*, 724 F.

Supp. 2d at 417-19.  While the court ultimately determined on summary judgment that the defendant "failed to establish mutual mistake by clear and convincing evidence," that is wholly irrelevant for purposes of this motion.  *Citibank II*, 797 F. Supp. 2d at 275.

Powermat's reliance on *McEachin v. Northland Grp., Inc.*, 2012 WL 6582423 (S.D.N.Y. Dec. 14, 2012), is similarly misplaced.  That case was also decided on summary judgment and the court performed *no analysis* of whether parol evidence is admissible under New York law to establish mutual mistake.  *Id.* at * 7.  Rather, the court *assumed* that the contract's integration clause would bar any consideration of parol evidence, but did not need to decide the issue because it concluded that the email in question did "not reveal [a] mutual mistake" and thus there was "no evidence of any mistake on the part of any party other than [p]laintiff."  *Id.* at *7-8. That is hardly sufficient to mark a major shift in New York law.

*VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 527 (S.D.N.Y. 2013), is even further afield.  There, the court found that the complaint alleged "no facts" supporting an inference of a mutual mistake, so it had no occasion to address whether the contract's integration clause would bar it from considering parol evidence.  *Id.* at 531-32 ("[Defendant] may have struck a bad bargain for itself—but no facts support that the Agreement reflects a 'legal' mistake.").  The same was true in *K.G. Cornwall, LLC v. Beazer Homes Corp.*, 2008 WL 563466, at *2 (S.D.N.Y. Feb. 28, 2008), where the court found no evidence of an oral agreement or mutual mistake and held that "[i]n light of the Integration Clause in the Agreement, . . . we cannot *imply* the existence of an oral understanding."  *Id.* at *2 (emphasis added).  Here, by contrast, the Complaint makes specific allegations supporting Belkin's reformation claim, including Powermat's contemporaneous written and oral statements about the License

Agreement's intended scope and Powermat's own course of performance over the 16 months following the agreement's execution—allegations absent in *VoiceAge* and *K.G. Cornwall*.[2]

In sum, there is no basis under New York to ignore the factual allegations supporting Belkin's reformation claim, and Powermat does not identify any New York case to the contrary. Powermat's motion for judgment on the pleadings must be denied on this basis alone. *See Brandwein*, 3 N.Y.2d at 496–97 (reversing lower court and denying motion for judgment on pleadings where factual allegations were sufficient to support reformation despite contract's integration clause).

### C.    If Belkin's Reformation Claim Lacks Sufficient Particularity, Belkin Should Be Granted Leave to Replead.

To the extent the Court were to find that Belkin's reformation claim lacks sufficient particularity, Belkin should be granted leave to replead and add additional factual allegations concerning the parties' negotiations and mutual mistake. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 312 (S.D.N.Y. 2008) ("[W]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint. This is especially true when a complaint is dismissed for lack of specificity under Federal Rule of Civil Procedure 9(b).") (collecting cases) (internal quotation marks and citations omitted).

Among other things, Belkin would add allegations describing how (i) the negotiations of the License Agreement were rushed due to an imminent product launch and the parties ended up signing a redline draft with law firm headers and unaccepted track changes before a final version was proofed; (ii) Powermat's demand for Qi-only royalties turns entirely on *three words* in two

---

[2] Plaintiffs' reliance on *Caisse Nationale De Credit Agricole-CNCA, New York Branch v. Valcorp, Inc.*, 1992 WL 245500 (S.D.N.Y. Sept. 17, 1992) is also misplaced. There, the court granted summary judgment for the plaintiff after finding that "the defendant actually paid over $3.5 million on the note and only raised this [mutual mistake] 'defense' in response to this lawsuit." *Id.* at *6. The opposite is true here, where Belkin *never paid* and Powermat *never demanded* royalties on Qi-only products during the first 16 months that the License Agreement was in effect.

definitions (Licensed Receiver and Licensed Transmitter) that are not in the body of the License Agreement, but rather in an exhibit that was not properly vetted by either party due to the rushed timeline; (iii) Powermat's current explanation (in a footnote) for the major discrepancy between the definitions of Licensed Chipsets, Licensed Receiver, and Licensed Transmitter is factually inaccurate, nonsensical in the context of the wireless charging industry, unsupported by any evidence, and further confirmation that the parties made a mistake; and (iv) Powermat's failure to grant Belkin a technology license for Qi products reflects Powermat's understanding that the License Agreement would not cover Qi-only products.

The truth is that while Powermat's motion tries to create the impression that the License Agreement was carefully crafted by two sophisticated parties, the facts show the opposite:  the License Agreement was rushed across the finish line and, unsurprisingly, contains several mistakes and conflicting provisions.  It should be reformed to reflect the parties' actual intent, as reflected in their pre-execution communications and their course of performance over the 16 months following its execution.

## II.    The License Agreement Is Ambiguous as to Whether Qi-Only Receivers and Transmitters Are Subject To Royalties.

While Belkin's reformation claim is the most straightforward basis for denying Powermat's motion, the motion should also be denied because the License Agreement is ambiguous as written and there are factual questions regarding the intended meaning of the royalty provisions that cannot be resolved on the pleadings.  *See Citibank I,* 724 F. Supp. 2d at 404 ("Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court. However, when a contract is ambiguous, its interpretation becomes a question of fact not appropriately resolved on a motion for judgment on the pleadings or for dismissal.").

Under New York law, courts must give effect to the parties' intent at the time they entered into the contract. *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. Ct. App. 2004). To ascertain the parties' intent, courts must read the contract as a whole, *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993), because "the intention of the parties is not derived from sentences or clauses read in isolation," *Sure-Trip, Inc. v. Westinghouse Engineering*, 47 F.3d 526, 533 (2d Cir. 1995). Courts must also "accord [contractual] language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) (quoting *William C. Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524, (1927) (second alteration in original)).

Contractual language is not ambiguous simply because the parties urge different interpretations. *Sayers*, 7 F.3d at 1095; *Seiden Assoc. Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). Rather, an ambiguity exists where a contract term is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," *Seiden*, 959 F.2d at 428 (internal quotation marks and citation omitted), or where the interrelationship of two provisions is susceptible to different reasonable interpretations. *See Williams & Sons Erectors, Inc. v. South Carolina Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993) (holding that a contract was ambiguous because the "interrelationship of . . . two provisions" was "susceptible to different reasonable interpretations"); *Seiden*, 959 F.2d at 430 ("because the interrelationship of the two provisions in the letter agreement is susceptible to several reasonable interpretations, the contract is ambiguous").

13

Here, the License Agreement is ambiguous because it contains two provisions that, while arguably unambiguous on their own, are not easily reconciled and make the contract as a whole reasonably susceptible to the interpretation that it was not intended to cover Qi-only devices. First, Section 2.3 of the License Agreement grants Belkin a broad license for *all* rights related to PMA, but *no license* for technology or trade secrets related to Qi.  That would be illogical, contrary to industry custom and practice, and lead to absurd results if the License Agreement were intended to cover Qi-only products, as Powermat now claims.  Second, the definition of Licensed Chipset excludes Qi-only devices, in direct conflict with the definitions of Licensed Receiver and Licensed Transmitter.  As the License Agreement makes clear, the parties understood and agreed that Licensed Chipsets would be used to manufacture Licensed Receivers or Transmitters, so the Court will need to determine based on extrinsic evidence which of these competing definitions reflects the parties' actual intent when entering the contract.

### A.   The Scope of Belkin's Technology License Strongly Suggests that the License Agreement Was Not Intended to Cover Qi-Only Devices.

The License Agreement is not merely a patent licensing agreement.  Powermat provided Belkin a broad license for a bundle of rights, including all technology, trade secrets, copyrights, and patents related to the PMA standard.  Section 2.3 of the License Agreement provides, in relevant part, that Powermat:

> grants to [Belkin], during the Term, a worldwide, non-exclusive, non-transferable . . . and non-sublicensable license to use the Interoperability Technology, including copyrights and trade secrets embodied therein, solely *to the extent required to implement the PMA Specification in connection with making or using Licensed Products or products integrating Licensed Products*.

(License Agreement, § 2.3 (emphasis added); *see also id.* § 2.1 (patent license).)

14

"Interoperability Technology," in turn, is defined as

> certain proprietary technology of Powermat that is included within the PMA Specification and is necessary for implementing the PMA Specification in order to make a Licensed Product, including technology necessary to enable Network Connectivity for a PMA-compliant Licensed Receiver.

(*Id.* Ex. A ¶ 3.) Notably, the License Agreement *does not grant Belkin a license to use any proprietary Powermat technology or trade secrets related to Qi*.

This is important because it would be both illogical and contrary to industry custom and practice for Belkin to license Powermat's patents covering PMA and Qi without also obtaining a license to any technology or trade secrets relating to PMA and Qi. The fact that Plaintiff did not grant such rights to Belkin is strong evidence that the parties never intended the License Agreement to cover products that were not implementing the PMA standard or Powermat's PMA-related technology and trade secrets. At a minimum, this creates a question of fact that can be resolved only with extrinsic evidence of the parties' intent. The Court should therefore deny Plaintiff's motion for judgment on the pleadings on this basis as well.

### B. The Definition of Licensed Chipset Conflicts with the Definitions of Licensed Receivers and Transmitters.

The License Agreement is also ambiguous because of the direct conflict between the definition of Licensed Chipset and the definitions of Licensed Transmitters and Receivers. The chipset is the "brain" of a wireless charging device and the subject of many of Powermat's patents related to the PMA standard. Indeed, the difference in chipset specifications is what distinguishes the PMA and Qi standards, given that both rely on a generic copper charging coil. The central role of the chipset is reflected in Exhibit B to the License Agreement, which provides that Belkin does not owe separate royalties on Licensed Chipsets, but rather pays "the royalty rate that is applicable to the Licensed Product in which the Licensed Chipset is intended to be

used." (License Agreement, Ex. B.) Accordingly, if Powermat had intended to license its patents or technology to Belkin for use in Qi-only devices, the definition of Licensed Chipset would reflect this. But it does not.

Under the License Agreement, Licensed Chipsets are defined to include a chipset "(a) for wireless power or that is capable of enabling wireless power charging for either Licensed Receivers or Licensed Transmitters, (b) *that implements elements of the PMA specification or both the PMA specification and the Qi specification*, and (c) *which, once joined with other components, becomes a Licensed Receiver or Licensed Transmitter*. (*Id.*, Ex. A, ¶ 6 (emphasis added).) Notably absent from this definition are chipsets that implement *only* the Qi specification. Rather, subparts (b) and (c) reflect the parties' agreement and understanding that Belkin would use chipsets implementing the PMA standard or both the PMA *and* Qi standards— but not the Qi standard alone—to manufacture Licensed Receivers and Licensed Transmitters. That is precisely the type of license for which Belkin approached Powermat, and the only type of license that the parties discussed while negotiating the License Agreement. (Answer ¶ 64.)

To interpret the contract as requiring *no royalties* to be paid on Qi-only (unlicensed) chipsets (which contain the underlying technology fundamental to the operation of the device), while at the same time *requiring* royalties to be paid on Qi-only (licensed) transmitters or receivers implementing Qi-only chipsets is nonsensical and antithetical to industry custom and practice. The chipset is an integral component of a transmitter or a receiver. It would be incongruous to transform an unlicensed chipset into a licensed product merely by the addition of a coil. *See, e.g.*, *Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 65 (2d Cir. 2010) ("declin[ing] to endorse" "interpretation of the Agreement [that] leads to an illogical result").

Accepting Plaintiff's interpretation of Licensed Chipset as not being a necessary component of a Licensed Product would also render the definition of Licensed Chipset wholly superfluous.  *Sayers*, 7 F.3d at 1095 (the court must consider the entire contract in order to avoid "render[ing] any individual provision superfluous"); *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1993) (an interpretation of contract language "that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect").  As royalties are not payable on Licensed Chipsets alone, but rather on the Licensed Product in which the Licensed Chipset is intended to be used, Plaintiff's interpretation would leave no room for the definition of Licensed Chipset.  The parties could simply have excluded it.  But they included it to make clear that Belkin would have a license to use both PMA and PMA/Qi chipsets and would owe royalties on both—they did not contemplate that Belkin would owe royalties on Qi-only chipsets.

Powermat's cursory footnote explaining these conflicting definitions is unpersuasive. Powermat asserts that the definition of Licensed Chipsets does not include chips implementing only the Qi standard because "Powermat had no Qi-only licenses to chipmakers" and therefore "Belkin could buy no 'licensed' Qi-only chipsets."  (Mot. at 10 n.2.)  But under the plain language of the License Agreement, the definition of Licensed Chipsets has *nothing to do with Powermat's licensing agreements with third-party chipmakers*.  Rather, the License Agreement defines those chipsets that *Belkin* is licensed to sell under the agreement—*i.e.*, chipsets implementing PMA or both PMA *and* Qi.  Powermat's attempt to twist this definition and explain it away with unsupported factual assertions only reinforces the agreement's ambiguity and the absurdity of Powermat's position.

Given that the conflicting definitions of Licensed Chipsets, Licensed Transmitters, and Licensed Receivers create ambiguity regarding the License Agreement's intended scope, "an opportunity to present extrinsic evidence must be afforded to [Belkin to] establish what the . . . parties intended." *Seiden*, 959 F.2d at 429-30 (reversing district court order finding contract's language unambiguous because "it erroneously emphasized the import" of one provision over the other and "thereby ignored alternative reasonable interpretations of how the two provisions interrelate").

## III.   Powermat Ignores Belkin's Other Defenses to Liability, Which Cannot Be Dismissed on the Pleadings.

While Belkin believes that the Court need not reach its affirmative defenses to deny Powermat's motion, this does not excuse Powermat's failure to address Belkin's waiver, laches, estoppel, unclean hands, and lack of consideration defenses, each of which compels denial of Powermat's motion.  In particular, whether Powermat's conduct, including its 16-month delay in seeking royalties from Belkin on Qi-only devices, was unreasonable, rises to the level of waiver, and/or estops it from belatedly seeking those royalties is a factual question that cannot be resolved on this motion.  *See Vasquez v. Mullooly, Jeffrey, Rooney & Flynn LLP*, 2017 WL 4402567, at *3 (S.D.N.Y. Sept. 30, 2017) (denying motion for judgment on the pleadings because defendant's affirmative defenses raised "issue of fact"); *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1159 (9th Cir. 2015) ("[T]he court should determine whether the defendant has asserted a legally viable affirmative defense assuming all of the facts alleged by the defendant are true.  If the defendant has alleged an adequate affirmative defense, the motion [for judgment on the pleadings] is denied."); *Strum v. Bd. of Ed. of City of N.Y.*, 76 N.Y.S.2d 681, 683 (Sup. Ct. 1947), *aff'd*, 96 N.E.2d 192 (N.Y. Ct. App. 1950) ("Whether the plaintiff will satisfactorily explain the delay . . . will obviously involve issues of fact, and attendant

circumstances, matters not before this court, and not properly determinable upon a motion of this nature.").

Moreover, Powermat has waived any arguments about the merits of Belkin's defenses by failing to raise them in its opening brief, and Powermat cannot raise them for the first time on reply because Belkin would have no opportunity to respond. *See Conn. Indemn. Co. v. QBC Trucking, Inc.*, 2005 WL 1427424, at *1-2 (S.D.N.Y. June 20, 2005) ("The issue presented . . . was raised for the first time in [the movant's] reply papers . . . .  It was entirely appropriate for this Court to decline to consider that question on the summary judgment motion."); *Landau v. New Horizon Partners, Inc.*, 2003 WL 22097989, at *10 (S.D.N.Y. Sept. 8, 2003) (rejecting argument "raised for the first time in . . . reply papers . . . because the plaintiff had no opportunity to respond to such arguments, and in any event, full consideration and development of this issue requires that the argument be raised in the original moving papers"); *Playboy Enters. Inc. v. Dumas*, 960 F. Supp. 710, 720 n. 7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court."), *aff'd.,* 159 F.3d 1347 (2d Cir. 1998).

## IV.    The Court Should Grant Belkin's Cross-Motion and Enforce the Limitation-of-Liability Provision Against Powermat.

Powermat's motion should be denied for all the reasons described above.  The Court can and should, however, grant judgment in favor of Belkin on its fifth affirmative defense based on the License Agreement's limitation-of-liability provision.[3]  New York courts have routinely held that the applicability of such provisions can be decided on the pleadings and claims for damages

---

[3] That defense states "Powermat's breach of contract claim is barred or limited by the License Agreement's Limitation of Liability provision, which precludes Powermat from recovering consequential or indirect damages and caps Belkin's potential liability to Powermat at the total royalties paid over the twelve months immediately preceding the date on which Powermat's claim was made."  (Answer ¶ 62.)

beyond a limitation's scope should be dismissed.  *See, e.g.*, *Media Glow Dig., LLC v. Panasonic Corp. of N. Am.*, 2018 WL 2175550, at \*5–\*8 (S.D.N.Y. May 11, 2018) (granting defendant's motion for partial judgment on the pleadings, enforcing limitation-of-liability provision, and dismissing all claims for damages barred by that provision); *Pacs Indus. v. Cutler-Hammer, Inc.*, 103 F. Supp. 2d 570, 573 (E.D.N.Y. 2000) (same).

In contrast to the licensing and royalty provisions discussed above, the License Agreement's limitation-of-liability provision is unambiguous.  It states:

> TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER PARTY WILL HAVE LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE THEORY OF LIABILITY (INCLUDING THEORIES OF CONTRACTUAL LIABILITY, TORT LIABILITY, OR STRICT LIABILITY), NOR LIABILITY FOR LOST PROFITS, LOSS OF BUSINESS OPPORTUNITY, OR BUSINESS INTERRUPTION, EVEN IF THE PARTY FROM WHOM THOSE DAMAGES ARE SOUGHT KNEW OR SHOULD HAVE KNOWN THAT THOSE KINDS OF DAMAGES WERE POSSIBLE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PRECEDING SENTENCE, <u>EACH PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE TOTAL AMOUNT OF FEES PAID BY LICENSEE TO POWERMAT OVER THE TWELVE MONTHS IMMEDIATELY PRECEDING THE DATE FOR WHICH THE CLAIM WAS MADE.</u>

(License Agreement § 13 (capital letters and underlining in original).)

The first sentence of this provision limits both parties' respective liability for breach to direct (*i.e.*, general) damages.  The second sentence, in turn, limits those direct damages—*i.e.*, "each party's total liability"—to the total amount of fees Belkin paid to Powermat during the 12 months prior to Powermat's claim.  No other reading of this provision is plausible, and other New York courts have interpreted almost identical provisions in this same way.  *See Tradex Europe SPRL v. Conair Corp.*, 2008 WL 1990464, at \*1, \*2 n.2 (S.D.N.Y. May 7, 2008);

*Electron Trading LLC v. Morgan Stanley & Co. LLC*, 2017 WL 1479483, at *3 (N.Y. Sup. Ct. Apr. 25, 2017).  In *Tradex*, for example, the court explained that "[p]ursuant to the damages limitation provisions, Plaintiffs' damages for any breach of contract on the part of Defendant [were] limited to actual direct damages.  Plaintiffs' actual direct damages are in turn limited to 'THE TOTAL AMOUNT PAID TO [PLAINTIFFS] BY SCUNCI [FOR THE PRECEDING TWELVE MONTH PERIOD].'"  2008 WL 1990464, at *2 n.2 (capitalization in original; alteration to limitation-on-liability provision by court).

New York courts have also found similar language to be unambiguous.  In *Electron Trading LLC*, for example, the court considered a provision providing that "neither party's total liability under this agreement will exceed the total amounts previously paid by company to licensor under this agreement and the consulting agreement prior to the date of the applicable claim." 2017 WL 1479483, at *3.  The court held that this provision was unambiguous on its face and should be interpreted in accordance with its plain meaning.  *Id.*  The court also rejected the plaintiff's argument (which Powermat has indicated it intends to raise here) that this "plain meaning" would "render the contract illusory, because then [defendant] could theoretically breach the [contract] prior to making any payment, leaving [plaintiff] without a remedy."  *Id.* at *4.  The court held that "[m]erely because [plaintiff] is able to construct a hypothetical scenario under which its damages might be de minimus [sic], that does not make" the agreement illusory. *Id.*  The court pointed to the fact that the parties operated under the agreements for seven months before the alleged breach and that the defendant made payments during that time—just as Belkin undisputedly did here for 16 months.  *Id.*  The court made clear that *"[t]he fact that [plaintiff] is now dissatisfied with the consequences of the provision's application is no reason to void the provision,"* and concluded that the provision was unambiguous and enforceable.  *Id.*

21

The same result is warranted here, as the Court can readily determine based on the pleadings and the License Agreement that Belkin's "*total liability*" "shall not exceed the total amount of fees paid by Belkin to Powermat over the twelve months immediately preceding the date for which the claim was made."  (License Agreement § 13 (emphasis added).)  There is nothing ambiguous about this clause; it means exactly what it says.  *See Alghadeer Bakery & Mkt., Inc. v. Worldpay US, Inc.*, 2018 WL 5016496, at *3 (N.D. Ga. Oct. 16, 2018) (finding similar limitation-of-liability provision providing that liability was "not to exceed total fees and charges in the three-month period preceding the event" to be "explicit, prominent, clear, and unambiguous").

Nowhere in its pleadings does Powermat dispute the limitation's enforceability or contend that it is ambiguous.  Nor could it.  Powermat drafted and insisted on inserting this language into the contract verbatim—not a single word was changed.  (*See* License Agreement § 13.)  And such provisions are presumptively enforceable, particularly when they are negotiated by sophisticated parties.  *See, e.g.*, *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994) ("A limitation on liability provision in a contract represents the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor. . . .  *[The parties] may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made*." (emphasis added)); *Media Glow*, 2018 WL 2175550 at *5 ("New York courts have routinely enforced liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed.") (internal quotation marks omitted); *Five Star Dev. Resort Cmtys. v. iStar RC Paradise Valley*, 2012 WL 4119561, at *3 (S.D.N.Y. Sept. 18, 2012)

(same); *Pacs*, 103 F. Supp. 2d at 573–74; *Electron Trading*, 2017 WL 1479483, at *4 (finding similar limitation on damages provision valid, unambiguous, and its "plain meaning enforceable" because "[t]he fact that [plaintiff] is now dissatisfied with the consequences of the provision's application is no reason to void the provision").

Accordingly, this Court should grant Belkin's cross-motion for judgment on the pleadings on its fifth affirmative defense and dismiss Plaintiff's claims to the extent they seek damages beyond what Belkin paid in the 12 months preceding the date for which Powermat's claim against Belkin was made. Those payments total only several hundred thousand dollars, not the millions of dollars that Powermat seeks, and if the Court granted Belkin's cross-motion, the parties' could easily calculate the exact amount and work to resolve this dispute amicably. By contrast, if the cross-motion were denied or the limitation-of-liability issue held in abeyance, the scope of potentially relevant damages-related discovery would expand exponentially to include, for example, expert testimony on Belkin's future sales. Belkin should not be burdened with such costly and time-consuming discovery when the limitation-of-liability provision is so clear cut.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for Judgment on the Pleadings and grant Belkin's Cross-Motion, dismissing Plaintiff's claims to the extent they seek damages beyond what Belkin paid in the 12 months immediately preceding the date for which Powermat's claim was made.

Dated:   June 20, 2019

Respectfully submitted,

By: */s/ Andrew J. Frackman*
Andrew J. Frackman
Brad M. Elias
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel: (212) 326-2000
Fax: (212) 326-2061
Email: afrackman@omm.com
Email: belias@omm.com

Ryan K. Yagura
(*admitted pro hac vice*)
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
Tel: (213) 430-6000
Fax: (213) 430-6407
Email: ryagura@omm.com

Matt Kline
(*admitted pro hac vice*)
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Office: (310) 553-6700
Fax: (310) 246-6779
Email: mkline@omm.com

*Counsel for Defendant Belkin
International, Inc.*