IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

POWERMAT TECHNOLOGIES, LTD.,

      Plaintiff,

    v.

BELKIN INTERNATIONAL INC.,

      Defendant.

Case No. 1:19-cv-878-VSB

JURY TRIAL

**POWERMAT'S COMBINED (1) MEMORANDUM OPPOSING BELKIN'S CROSS-MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS & (2) REPLY MEMORANDUM SUPPORTING POWERMAT'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... ii

TABLE OF AUTHORITIES .......................................................................................... iii

INTRODUCTION ...............................................................................................................1

ARGUMENT ......................................................................................................................2

I.      The License Agreement's limitation-of-liability clause does not limit Powermat's
        right to collect royalties. ........................................................................................2

        A.      The License Agreement's plain text refutes Belkin's reading of the
                limitation-of-liability clause ......................................................................2

        B.      Basic contract-law principles expose Belkin's reading of the limitation-of-
                liability clause as unreasonable ..................................................................4

        C.      Belkin's arguments and authorities miss the point. ...................................7

II.     The License Agreement unambiguously requires Belkin to pay royalties on all Qi-
        enabled receivers and transmitters. ........................................................................8

        A.      Belkin concedes or ignores Powermat's arguments that the License
                Agreement's royalty base is unambiguous. ................................................8

        B.      The grant of a license to non-patent "Interoperability Technology" casts no
                doubt on the patent-license scope. .............................................................9

        C.      The definitions of Licensed Chipsets, Licensed Receiver, and Licensed
                Transmitter are easily harmonized and create no ambiguity .................... 10

III.    Belkin's reformation claim fails on the pleadings. ............................................... 13

        A.      The License Agreement specifically disclaims the predicate for Belkin's
                reformation claim: a previous oral agreement. ........................................ 13

        B.      Even if the Court considers Belkin's allegations about matters outside the
                License Agreement, they state no viable reformation claim. .................... 17

IV.     Belkin's affirmative defenses do not preclude partial judgment on the pleadings. .......... 21

        A.      Powermat did not waive challenges to Belkin's defenses by not raising
                them in its opening brief. .......................................................................... 21

        B.      Belkin's equitable defenses of waiver, laches, estoppel, and unclean hands
                do not apply to Powermat's damages claim ............................................. 22

        C.      Belkin pleads insufficient facts to sustain its affirmative defenses. ........ 23

CONCLUSION ................................................................................................................. 25

CERTIFICATE OF SERVICE ......................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**      **Pages**

*159 MP Corp. v. Redbridge Bedford, LLC*,
    --- N.E.3d ----, 2019 WL 1995526 (N.Y. May 7, 2019)...........................................................15

*28th Highline Assocs., L.L.C. v. Roache*,
    No. 18 CIV. 1468, 2019 WL 917208 (S.D.N.Y. Feb. 25, 2019) .............................................21

*ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*,
    485 F.3d 85 (2d Cir. 2007) .........................................................................................................2

*Ajdler v. Province of Mendoza*,
    890 F.3d 95 (2d Cir. 2018) .........................................................................................................4

*Apfel v. Prudential-Bache Securities Inc.*,
    616 N.E.2d 1095 (N.Y. 1993) ...................................................................................................25

*Bakalar v. Vavra*,
    819 F. Supp. 2d 293 (S.D.N.Y. 2011).......................................................................................24

*Barash v. Pennsylvania Terminal Real Estate Corp.*,
    26 N.Y.2d 77 (N.Y. 1970) ..................................................................................................14, 15

*Brandwein v. Provident Mut. Life Ins. Co. of Philadelphia*,
    3 N.Y.2d 491 (N.Y. 1957) .........................................................................................................15

*Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*,
    773 F.3d 110 (2d Cir. 2014) .......................................................................................................2

*Chimart Assocs. v. Paul*,
    66 N.Y.2d 570 (N.Y. 1986) ..............................................................................13, 15, 16, 17

*Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*,
    797 F. Supp. 2d 254 (S.D.N.Y. 2011)...............................................................................17, 19

*Collins v. Harrison-Bode*,
    303 F.3d 429 (2d Cir. 2002) ...................................................................................15, 17, 21

*Danann Realty Corp. v. Harris*,
    5 N.Y.2d 317 (N.Y. 1959) ..................................................................................................14, 15

*Doe v. Deer Mountain Day Camp, Inc.*,
    682 F. Supp. 2d 324 (S.D.N.Y. 2010) ......................................................................................24

*Electron Trading LLC v Morgan Stanley & Co. LLC*,
    No. 651370/2015, 2017 WL 1479483 (N.Y. Sup. Ct. Apr. 25, 2017).....................................7, 8

*Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*,
  343 F. Supp. 3d 789 (N.D. Ill. 2018) ....................................................................4, 5, 7

*Great Minds v. Fedex Office & Print Servs., Inc.*,
  886 F.3d 91 (2d Cir. 2018) ...................................................................................11

*Gulf Ins. Co. v. Transatlantic Reinsurance Co.*,
  69 A.D.3d 71 (N.Y. App. Div. 2009)........................................................................21

*Harmit Realities LLC v. 835 Awe. Of the Americas, L.P.*,
  23 N.Y.S.3d 230 (N.Y. App. Div. 2016).....................................................................14

*Horvath v. High Peaks Sand, Gravel & Minerals, LLC*,
  No. 904568-16, 2018 WL 3973426 (N.Y. Sup. Ct. Aug. 1, 2018)........................................23

*In re Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*,
  865 F. Supp. 2d 469 (S.D.N.Y. 2012) ....................................................................18

*J & J Sports Prods., Inc. v. Patin*,
  358 F. Supp. 3d 318 (S.D.N.Y. 2019) ....................................................................23

*JA Apparel Corp. v. Abboud*,
  568 F.3d 390 (2d Cir. 2009) ..................................................................................9

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
  386 F. Supp. 2d 461 (S.D.N.Y. 2005) ....................................................................23

*K.G. Cornwall, LLC v. Beazer Homes Corp.*,
  No. 07 Civ. 2881(CLB), 2008 WL 563466 (S.D.N.Y. Feb. 28, 2008)....................................17

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
  306 F. Supp. 3d 629 (S.D.N.Y. 2018) ....................................................................24

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
  784 F.3d 78 (2d Cir. 2015)...............................................................................6, 7

*Mastrovincenzo v. City of New York*,
  435 F.3d 78 (2d Cir. 2006) ..................................................................................6

*Maxim Grp. LLC v. Life Partners Holdings, Inc.*,
  690 F. Supp. 2d 293 (S.D.N.Y. 2010) ...............................................................22, 23

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
  842 F. Supp. 2d 682 (S.D.N.Y. 2012) ....................................................................24

*McEachin v. Northland Grp., Inc.*,
  No. 12 Civ. 3283(CM), 2012 WL 6582423 (S.D.N.Y. Dec. 14, 2012)..............................16, 19

*Muttontown Pictures, Inc. v. Levine*,
  370 N.E.2d 62 (N.Y. App. Div. 1975) .................................................................. 4

*Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*,
  472 F.3d 33 (2d Cir. 2006) .............................................................................. 10

*Philippe Nyc I LLC v. Philippe W. Coast, LLC*,
  No. 14 CIV. 9858 (NRB), 2016 WL 1183669 (S.D.N.Y. Mar. 24, 2016) .............. 20

*SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*,
  137 S. Ct. 954 (2017) ..................................................................................... 23

*Shechter v. Comptroller of City of New York*,
  79 F.3d 265 (2d Cir. 1996) ............................................................................. 25

*Spinelli v. Nat'l Football League*,
  903 F.3d 185 (2d Cir. 2018) ...................................................................... passim

*Stone Key Partners LLC v. Monster Worldwide, Inc.*,
  333 F. Supp. 3d 316 (S.D.N.Y. 2018) ............................................................. 20

*Sunshine Imp & Exp Corp. v. Luxury Car Concierge, Inc.*,
  No. 13 C 8925, 2015 WL 2193808 (N.D. Ill. May 7, 2015) ............................... 22

*Tradex Europe SPRL v. Conair Corp.*,
  No. 06 CIV.1760 KMW FM, 2008 WL 1990464 (S.D.N.Y. May 7, 2008) .............. 7

*Trilegiant Corp. v. Orbitz, LLC*,
  993 N.Y.S.2d 462 (N.Y. Sup. Ct. 2014) ........................................................... 25

*Two Farms, Inc. v. Greenwich Ins. Co.*,
  993 F. Supp. 2d 353 (S.D.N.Y. 2014) ............................................................... 2

*United Cent. Bank v. Wells St. Apartments, LLC*,
  957 F. Supp. 2d 978 (E.D. Wis. 2013) ............................................................ 22

*Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*,
  No. 1:10-CV-044 JD, 2018 WL 2328447 (N.D. Ind. May 22, 2018) ................... 22

*VoiceAge Corp. v. RealNetworks, Inc.*,
  926 F. Supp. 2d 524 (S.D.N.Y. 2013) ............................................................. 17

*Woodward v. Morgenthau*,
  740 F. Supp. 2d 433 (S.D.N.Y. 2010) ............................................................. 21

**INTRODUCTION**

A key concern of contract law is that a party may sign a contract but then try to avoid its duties by twisting the contract's words or claiming they do not reflect the real agreement. Belkin tries both, urging every conceivable ground not to pay the royalties it owes under these sophisticated parties' detailed written contract. Belkin's arguments fail.

I. According to Belkin's cross-motion, the parties signed a deal giving Belkin freedom to use Powermat's IP but discretion whether to pay royalties. The License Agreement does the opposite: it imposes a mandatory duty to pay royalties on all "Licensed Products" for a five-year term, with no right to terminate, and that duty survives the contract's term. Citing a general limitation-of-liability clause, Belkin seeks to limit Powermat's damages to the sum of its own (badly deficient) royalty payments over a one-year period. In short, Belkin argues that it could control how much underpayment Powermat can collect by choosing how much to pay (or not). Given the License Agreement's plain text, as well as its clear purpose and the parties' reasonable expectations, Belkin's interpretation is unreasonable.

II. Belkin's opposition to Powermat's motion claims that the License Agreement's royalty base is ambiguous or, if not, should be reformed for mutual mistake. Both claims fail. On ambiguity, Belkin fails to rebut Powermat's textual analysis of the royalty base. Instead, to show ambiguity, Belkin fabricates "conflicts" among various contract terms. But New York law forbids this straining; the Court must try to harmonize the contract's terms and can easily do so.

To plead mutual mistake, Belkin would have to allege facts showing *unequivocally* that the parties reached an oral agreement but wrote it down incorrectly. But the License Agreement disclaims oral agreements, thus barring parol evidence and destroying the necessary predicate for mutual mistake. And even if the Court considers Belkin's allegations based on parol evidence, they make no unequivocal showing. Belkin's reformation claim thus fails on the pleadings.

1

Finally, Belkin's affirmative defenses do not preclude partial judgment on the pleadings. Powermat did not waive its challenges to these defenses. Instead, Belkin had to argue its defenses in its response. And Belkin fails to state any viable defensive theories.

## ARGUMENT

### I.     The License Agreement's limitation-of-liability clause does not limit Powermat's right to collect royalties.

Belkin's cross-motion claims that its duty to pay royalties is optional. Belkin is wrong. Its reading of the License Agreement's limitation-of-liability clause ignores that clause's plain text capping only "total liability" for a "claim." Belkin also ignores basic New York contract law requiring courts to give meaning to all a contract's terms and to avoid absurd results.

#### A.     The License Agreement's plain text refutes Belkin's reading of the limitation-of-liability clause.

Under New York law, a court's main goal in interpreting a contract "is to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (quotation marks omitted). A court must "give each word and phrase in a contract its plain meaning." *Two Farms, Inc. v. Greenwich Ins. Co.*, 993 F. Supp. 2d 353, 360 (S.D.N.Y. 2014). The License Agreement's text refutes Belkin's interpretation.

The limitation-of-liability clause caps the parties' "total liability" at "the total amount of fees paid by [Belkin] to Powermat over the twelve months immediately preceding the date for which the claim was made." Ex. A § 13. So "liability," as used in § 13, refers to amounts recoverable by virtue of a "claim." *Id*. Unpaid royalties are not a "claim" under § 13, but an "underpayment" of "royalties" that must be "settled" under § 9. *See ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 102 (2d Cir. 2007) (stating the rule that specific contract terms govern over general ones).

The License Agreement specifically addresses the calculation and collection of royalties. To start, § 5.1 says Belkin "will pay to Powermat a running royalty" on all "Licensed Products" sold during the contract's term. Section 5.2 then requires Belkin to pay these royalties quarterly within 45 days after each calendar quarter. It also provides that any amount "not received by Powermat by the date it is due (including unpaid portions of amounts due) will bear interest, compounded monthly, at the U.S. prime rate then in effect." Next, § 7 requires Belkin to send Powermat a report within 30 days after each quarter (so 15 days before the royalties are due) detailing the Licensed Products Belkin sold that quarter and providing "a calculation of the royalties payable."

Against the backdrop of §§ 5 and 7, § 9 addresses underpayments. It first requires Belkin to keep at least three years' worth of records "adequate for Powermat or its representative to ascertain the royalties payable." It then lets Powermat audit those records "to verify [Belkin's] reporting of Licensed Products Sold and the amounts due and payable hereunder." If Belkin underpays or overpays royalties, then "the underpayment or overpayment shall be settled by the appropriate party within thirty (30) days of receiving notice thereof." Lastly, § 9 confirms that any underpaid amount bears interest "in accordance with Section 5.2."

These provisions do not refer to Powermat's right to unpaid royalties as a "claim." Instead, § 9 refers to "underpayment … by [Belkin] of any royalties," and to "[a]ny underpaid … amount." The word "claim" is nowhere in the sections addressing royalties or collection of them. And nothing in these sections suggests that Belkin can turn royalties into a "claim" or "total liability" subject to § 13 by not paying them on time.

### B.    Basic contract-law principles expose Belkin's reading of the limitation-of-liability clause as unreasonable.

*Courts must harmonize a contract's terms and avoid interpretations that render terms meaningless.* Courts must construe a contract "so as to give full meaning and effect to all of its provisions." *Ajdler v. Province of Mendoza*, 890 F.3d 95, 100 (2d Cir. 2018) (brackets and quotation marks omitted). They must avoid "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless." *Id*. And they must also strive to harmonize contract terms and avoid inconsistencies. *Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018). Thus, for example, the Appellate Division held that a general exculpatory clause did not reach a film distributor's specific duty to spend at least $200,000 promoting a film in the first year of a distributorship agreement. *See Muttontown Pictures, Inc. v. Levine*, 370 N.E.2d 62, 64 (N.Y. App. Div. 1975). A contrary reading, said the court, "totally nullifies [the distributor's] specific covenant" to spend that amount. *Id.*

Similarly, a federal court applying New York law held that a limitation-of-liability clause did not overcome a party's royalty obligation. *See Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 343 F. Supp. 3d 789, 803–04 (N.D. Ill. 2018). Sanofi argued that a clause barring recovery of "loss of profits" precluded Elorac from recovering lost royalties. *Id.* at 801–02. The court held, however, that the limitation did "'not encompass the royalty payments which are the fruit of the Agreement.'" *Id.* at 803 (quoting *Callisto Corp. v. Inter-State Studio & Pub. Co.*, No. CIV.A. 05-11953-GAO, 2006 WL 1240711, at *2 (D. Mass. May 4, 2006)). It explained that the agreement "spell[ed] out a detailed procedure for auditing royalty payments and remedying any overpayments or underpayments." *Id.* at 804. The agreement also "requir[ed] the parties to give one hundred eighty days' notice to terminate the agreement." *Id.* Said the court, "these protective features would be meaningless" if Elorac could not recover lost royalties in a suit for breach. *Id.* "There

would have been no point entering into such a detailed agreement if non-performance could carry no possibility of sanction." *Id.* (quotation marks omitted).

Here too, the limitation-of-liability clause would nullify detailed protective features if it limited recovery of unpaid royalties. The License Agreement makes royalties mandatory, providing that "[Belkin] will pay to Powermat a running royalty throughout the Term … on all Licensed Products." Ex. A § 5.1. And as we explained above, it specifies payment terms and requires interest on past-due amounts. *Id.* § 5.2. It also has detailed procedures for reporting sales, auditing royalties, and settling underpayments. *Id.* §§ 7, 9. All these terms would be meaningless if Powermat's right to collect unpaid royalties (and interest on them) were capped at whatever Belkin had voluntarily paid Powermat over the past year. *See Elorac*, 343 F. Supp. 3d at 803–04.

Also like the agreement in *Elorac*, the License Agreement forbids early termination of its five-year term (except under circumstances no one claims exist here). *See* Ex. A § 10. And it provides that its royalty terms survive termination or expiration. *Id.* § 10.5. Together, these terms ensure that Powermat earns royalties on *all* Belkin's Licensed Product sales during the term and that Powermat's right to collect those royalties does not diminish with time. Belkin's interpretation would nullify these terms too. Belkin could effectively terminate at any time by stopping paying royalties, thus locking in the maximum collectible amount (whatever it paid in the last year) and ensuring no more collectible royalties would accrue.

Finally, Belkin's interpretation is irreconcilable with several other terms. For example, the License Agreement expressly conditions Belkin's core rights on the payment of royalties: the patent license (§ 2.1), the license to Interoperability Technology (§ 2.3), the right to register products with the Powermat Network (§ 4.1), and the right to sell off Licensed Products for a six-month period after the License Agreement expires (§ 10.6). It would be meaningless to con-

dition Belkin's rights on the payment of royalties if Belkin could avoid most or all of its royalty obligation based on its own past underpayments. It would also be hard to square the requirement that Belkin keep *three years'* worth of records (§ 9) with a term capping Powermat's ability to recover unpaid royalties at the amount Belkin paid in the past year.

***Courts must honor the parties' reasonable expectation and avoid absurd results.*** Belkin's interpretation would also defy the parties' obvious expectation and purpose. In construing a contract, courts must take "into account the reasonable expectation and purpose of the ordinary businessperson." *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 91 (2d Cir. 2015) (brackets and quotation marks omitted). And they should avoid absurd results. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006).

Belkin's interpretation would produce the absurd result that Belkin has sole discretion over how much to pay Powermat or whether to pay anything at all. According to Belkin, Powermat can never recover more in unpaid royalties than Belkin paid in the year before Powermat sought to recover the payment—an amount Belkin controls. By this logic, Belkin could eliminate any outstanding balance simply by not paying Powermat anything for a year, no matter how many Licensed Products it sells. Or, as this case shows, Belkin could vastly reduce its balance by making only token payments on a fraction of its Licensed Product sales. Belkin could have even avoided paying any royalties whatsoever simply by never making the first payment; in that scenario, the cap would never exceed zero. In any event, Belkin would have complete control. The amount of protection it received from the limitation-of-liability clause would increase with the severity of its own breach: the more it underpays, the less underpayment Powermat can collect.

No reasonable businessperson would expect or agree that a licensee could limit or eliminate its royalty obligation by underpaying or not paying at all. As Belkin acknowledges, Power-

6

mat added the sentence Belkin relies on. *See* Opp. at 22. Surely no reasonable licensor would volunteer language that makes royalties optional, nor would any reasonable licensee understand Powermat's language that way. *See Luitpold*, 784 F.3d at 91. Thus, it would defy the parties' reasonable expectations and defeat the License Agreement's purpose to read the limitation-of-liability clause as applying to Belkin's royalty obligation.

### C.   Belkin's arguments and authorities miss the point.

Belkin grapples with none of these flaws in its interpretation. Belkin insists that "total liability" must include royalties. But it offers scant reasoning or analysis. *See* Opp. at 20. And Belkin's cases are not controlling because *none* applies a limitation-of-liability clause to "payments which are the fruit of the Agreement": accrued royalties or other amounts due and payable under a contract's specific terms. *See Elorac*, 343 F. Supp. 3d at 803. In fact, in most of Belkin's cases, the parties did not dispute that the limitation covered the claimed damages. The plaintiff instead argued that the limitation was *unenforceable* as a matter of public policy or because it was unconscionable, arguments Powermat does not make.

For instance, in *Tradex Europe SPRL v. Conair Corp.*, Tradex agreed to provide consulting services to Scunci in exchange for a commission on contracts it helped secure. *See* No. 06 CIV.1760 KMW FM, 2008 WL 1990464, at *1 (S.D.N.Y. May 7, 2008). Tradex claimed that Scunci's successor, Conair, interfered with Tradex's performance, thus preventing Tradex from earning any commissions. *See id.* at *2. So unlike here, Tradex was not seeking to recover amounts already due and payable under the contract (earned commissions). This Court granted summary judgment limiting Tradex's damages because it had not shown "intentional wrongdoing" sufficient to avoid the limitation under New York public policy. *See id.* at *4–5.

Belkin also discusses the state trial-court case *Electron Trading LLC v Morgan Stanley & Co. LLC*, No. 651370/2015, 2017 WL 1479483, at *1 (N.Y. Sup. Ct. Apr. 25, 2017). There too,

the plaintiff, Electron, did not seek to recover amounts due and payable under the contract. Instead, it claimed that the defendant, Morgan Stanley, breached a license agreement by failing to implement software it licensed from Electron. *Id.* at *2. The court rejected the argument that the agreement's limitation-of-liability clause could render the contract "illusory" because Morgan Stanley could breach before making any payment, thus capping Electron's damages at zero. *See id.* at *4. Belkin says this argument is like Powermat's argument here. *See* Opp. at 21. Not so. Unlike Belkin, Morgan Stanley was not urging the absurd result that it could limit or eliminate its own *accrued payment obligations* just by breaching those very obligations.

## II.   The License Agreement unambiguously requires Belkin to pay royalties on all Qi-enabled receivers and transmitters.

Turning to Powermat's motion, Belkin concedes or simply ignores Powermat's reasons why the definition of "Licensed Products" unambiguously includes Qi-only receivers and transmitters. But it points to two other parts of the contract that supposedly show the parties' intent to exclude Qi-only devices. First, Belkin says the separate license to *non-patent* PMA technology creates ambiguity about the scope of the *patent* license. *See* Opp. at 14–15. Second, Belkin says the definition of "Licensed Chipsets" creates ambiguity about the definitions of "Licensed Receiver" and "Licensed Transmitter" (all of which are "Licensed Products"). *See id.* at 15–18. Belkin's arguments again turn New York contract law on its head: this Court should try to harmonize these terms, not strain to find conflicts. *See Spinelli*, 903 F.3d at 200.

### A.   Belkin concedes or ignores Powermat's arguments that the License Agreement's royalty base is unambiguous.

Belkin has no answer to Powermat's discussion of the relevant text. First, Belkin does not discuss the definitions of Licensed Receiver and Transmitter—the products Belkin must pay royalties on. As Powermat explained, these terms unambiguously include all receivers and transmitters, respectively, "intended to be compliant or compatible with the PMA Specification *or Qi*

*Specification* or both the PMA Specification and Qi Specification." *See* Mem. at 6–7. Belkin seems to concede that these definitions are indeed "unambiguous on their own." *See* Opp. at 14.

Second, Powermat cited "[s]everal other terms" confirming that the definitions of Licensed Receiver and Transmitter reflect the parties' intent to cover Qi-only receivers and transmitters. *See* Mem. at 7–8. Perhaps most centrally, the License Agreement highlights the possibility of Qi-only Licensed Receivers by stating "that Licensed Receivers that are not PMA-complaint will not have Network Connectivity, even if they are Qi compliant." *See* Ex. A § 4.2. Belkin does not address this express acknowledgment or any of the License Agreement's terms placing PMA and Qi technology on equal footing. Instead, it wrongly insists that Powermat's position "turns entirely on *three words* in two definitions (Licensed Receiver and Licensed Transmitter)." Opp. at 11–12 (emphasis original). In fact, Powermat's position turns, as it must, on those definitions' plain language understood in light of the License Agreement "as a whole." *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009).

**B.  The grant of a license to non-patent "Interoperability Technology" casts no doubt on the patent-license scope.**

Belkin cites the License Agreement's grant of a license to Powermat's "Interoperability Technology," which consists of non-patent PMA technology. *See* Opp. at 14–15. Belkin claims—though with no authority or other support—that it would make no sense and would defy industry custom for Powermat to grant Belkin a patent license coving both PMA and Qi products while granting a non-patent license to only PMA-related IP (like copyrights and trade secrets). *Id*. at 15. Thus, says Belkin, a fact finder must decide whether the definitions of Licensed Receiver and Transmitter mean what they say. *Id*.

But there is nothing contradictory or otherwise ambiguous about a contract's granting patent and non-patent licenses with different scopes. So the license to Interoperability Technology

cannot override the plain definitions of Licensed Receiver, Licensed Transmitter, and Licensed Products. *See Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (stating that courts must enforce plain and unambiguous terms as written). Anyway, Belkin ignores the most obvious explanation for the different scopes: Powermat's patents cover both the PMA and Qi Specifications, but its non-patent IP related only to the PMA Specification. In other words, Powermat granted Belkin what it had at the time. So it is Belkin's position—not Powermat's—that makes no sense: there was no reason for Powermat to give Belkin a license to copyrights and trade secrets that did not exist.

### C.   The definitions of Licensed Chipsets, Licensed Receiver, and Licensed Transmitter are easily harmonized and create no ambiguity.

Belkin next claims that the definitions of Licensed Receiver and Transmitter "conflict" with the definition of Licensed Chipsets. *See* Opp. at 15–18. Here again, Belkin strains to find tension, and thus ambiguity, among contract terms that work in harmony. *See Uribe*, 693 N.E.2d at 743; *Spinelli*, 903 F.3d at 200.

We start with three key areas of agreement. First, the parties agree that the License Agreement's text includes Qi-only receivers and transmitters in the definitions of Licensed Receiver and Transmitter but does not include Qi-only chipsets in the definition of Licensed Chipsets (although they dispute this text's legal consequences). Second, the parties agree about the chipset's role in a wireless-charging device. As Belkin says, a wireless-charging chipset is a required part of a wireless-charging receiver or transmitter, dictating which standards the device will implement. *See* Opp. at 15. And third, the parties agree that Belkin sells—and owes royalties on—only complete wireless-charging receivers and transmitters, not standalone chipsets. Belkin admits that it "does not owe separate royalties on Licensed Chipsets, but rather pays 'the royalty

10

rate that is applicable to the Licensed Product in which the Licensed Chipset is intended to be used.'" *Id.* at 15–16 (quoting Ex. A at "Exhibit B").[1]

The dispute, then, is whether one could *reasonably* read the definition of Licensed Chipsets as narrowing the definitions of Licensed Receiver and Transmitter. *See Great Minds v. Fedex Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018) (observing that a contract is ambiguous only if it could have "two *reasonable* interpretations" (emphasis added)). One could not. The parties were free to define Licensed Chipsets as only *some* wireless-charging chipsets (that is, those that implement the PMA Specification but not those than implement only the Qi Specification). And while all Licensed Receivers and Transmitters need a wireless-charging chipset, they do not need a "Licensed Chipset." So there is nothing "nonsensical" or "incongruous" about defining Licensed Receivers and Transmitters to include devices containing either "Licensed Chipsets" or other, *unlicensed* wireless-charging chipsets. *Compare* Mem. at 9, *with* Opp. at 16. Belkin hardly addresses this point but offers only unreasoned attorney argument.

Belkin argues that giving the definitions of Licensed Receiver and Transmitter their plain meaning would read Licensed Chipsets out of the contract. *See* Opp. at 17. It contends that the parties included Licensed Chipsets to clarify which chipsets Belkin "would owe royalties on." *See id.* at 16–17. It is Belkin's reading, however, that reads Licensed Chipsets out of the contract. As we explained above, Belkin sells only complete receivers and transmitters and never sells (or, under the License Agreement, owes royalties on) chipsets alone. Thus, Licensed Receivers and Transmitters encompass all the Licensed Products that Belkin sells—the *whole* royalty base. For the very reason that "royalties are not payable on Licensed Chipsets alone" but are payable only

---

[1] Belkin also admits that it "has sold wireless-charging chipsets only after they have been incorporated into other wireless-charging devices." *See* Ex. B at 2.

on Licensed Receivers and Transmitters, *see id*. at 17, "Licensed Chipsets" would have no effect if it merely clarified which chipsets Belkin owes royalties on.

In contrast, Powermat's plain-language interpretation accounts for—and harmonizes—all the contract's terms. *See Spinelli*, 903 F.3d at 200. Section 5.1 says that if Belkin "purchases Licensed Products from a third party that is a licensee under a valid license agreement with Powermat for the Licensed Patents," then it owes no royalties "in connection with such Licensed Product." *See* Mem. at 10 n.2. This term ensures that Powermat collects just one royalty per end-user device, whether from a chipmaker or a manufacturer like Belkin. It achieves this end by eliminating from Belkin's royalty base the resulting receivers or transmitters when Belkin buys Licensed Chipsets from a Powermat licensee. Thus, the parties included Licensed Chipsets in the definition of Licensed Products not to *include* chipsets in the royalty base but to *exclude* some receivers and transmitters: those with chipsets for which a chipmaker already paid Powermat.[2]

Closing the loop, Powermat has (and when the parties signed the License Agreement, had) no Qi-only chipset licenses. Thus, Belkin cannot buy Qi-only chipsets for which a chipmaker already paid Powermat. And Belkin cannot sell Qi-only receivers and transmitters for which Powermat already collected royalties from a chipmaker. Powermat can collect royalties on these products *only* from Belkin. The parties therefore had no reason to include Qi-only chipsets in the definition of Licensed Chipsets and every reason to include Qi-only receivers and transmitters in the definitions of Licensed Receiver and Licensed Transmitter. This "discrepancy," if one might call it that, suggests no "conflict" but accounts for how the parties do business.[3]

---

[2] Section 5.4 works in harmony with § 5.1 to ensure that Powermat collects royalties at just one point in the value chain by providing that Powermat will not collect royalties from Belkin's customers on products for which Belkin has already paid royalties.

[3] Contrary to Belkin's argument, Powermat's explanation of these definitions does not show "a factual dispute" warranting parol evidence. *See* Opp. at 7 n.1, 17. In fact, the Court need not even accept any "factual assertions" by

### III.   Belkin's reformation claim fails on the pleadings.

Belkin cannot escape the License Agreement's terms by enforcing a contrary oral agreement. First, the License Agreement specifically disclaims prior oral agreements, thus barring Belkin from offering parol evidence to prove the same. Second, even crediting Belkin's allegations based on parol evidence, they support no plausible inference of mutual mistake.

### A.   The License Agreement specifically disclaims the predicate for Belkin's reformation claim: a previous oral agreement.

To justify its reliance on parol evidence, Belkin relies mainly on two cases the New York Court of Appeals decided a half-century ago or more. *See* Opp. at 8–9 (citing *Barash v. Pennsylvania Terminal Real Estate Corp.*, 26 N.Y.2d 77 (N.Y. 1970); *Brandwein v. Provident Mut. Life Ins. Co. of Philadelphia*, 3 N.Y.2d 491 (N.Y. 1957)). But these cases do not nullify the parol-evidence rule anytime a party claims reformation. To the contrary, the Court of Appeals more recently warned that admitting parol evidence to reform a contact "recreates the very danger against which the parol evidence rule and Statute of Frauds were supposed to protect—the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract." *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573 (N.Y. 1986). *Barash* and *Brandwein* do not control here for three reasons.

First, they deal with "general" merger clauses. *See* Opp. at 8–9. But in *Barash*, the court noted an "exception in cases of specific merger clauses." 26 N.Y.2d at 86 (citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320–21 (N.Y. 1959)). In *Danann*, the plaintiff acquired a building lease from the defendant and, later, sought to enforce unwritten oral promises about the build-

---

Powermat to accept Powermat's plain-language contract interpretation. The key point is that the Court *can* easily harmonize the various definitions, meaning Belkin's claimed "direct conflict" is fabricated and cannot show ambiguity. *See* Opp. at 15. As a matter of New York law, if the Court *can* harmonize the contract's terms while honoring its plain language, then it *should*—regardless of the extrinsic facts. *See Spinelli*, 903 F.3d at 200.

ing's operating expenses and the profits it would make. *Id.* at 319. But the parties' contract disclaimed "representations as to the physical condition, rents, leases, *expenses, operation* or any other matter or thing affecting or related to" the building. *Id.* at 320 (emphasis original). The court held that this "specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon … contrary oral representations." *Id.* at 320–21. The court also noted that, as here, the plaintiff did not allege that it did not read or understand the disclaimer, nor that it was procured by fraud. *Id.* at 321; *see also Harmit Realities LLC v. 835 Ave. of the Americas, L.P.*, 23 N.Y.S.3d 230, 231 (N.Y. App. Div. 2016) (holding that "express disclaimers" barred a reformation claim based on oral representations about the disclaimed matters).

Here too, the parties *specifically* disclaimed oral agreements about the definition of "Licensed Products." To start, the parties *specifically* defined "Licensed Products" and its sub-parts, "Licensed Chipsets," "Licensed Receiver," and "Licensed Transmitter." And they included a section titled "Entire Agreement." *See* Ex. A § 14.5. Section 14.5's first sentence is perhaps a "general" merger clause. *Id*. Its second sentence, however, *specifically* provides that the License Agreement supersedes prior agreements, whether written or oral, about "the matters that this Agreement addresses" (which "matters" include the definition of "Licensed Products"). *Id*. The second sentence also *specifically* provides that "previous oral agreements about those matters do not have any legally binding force." *Id*. Thus, between *specifically* defining the royalty base and *specifically* disclaiming prior oral agreements about the royalty base, the parties did everything possible to guard against the "danger" that a party would "falsely claim the existence of a different, oral contract." *See Chimart*, 66 N.Y.2d at 573. If this is not enough, "then no language can accomplish that purpose." *See Danann*, 5 N.Y.2d at 323.[4]

---

[4] Surely few New York businesses would fear Belkin's competing policy concern: if Powermat is right, then parties

Second, and relatedly, in both *Barash* and *Brandwein*, the party urging reformation sought to *supplement* the writing with an allegedly omitted term—not to contradict an existing term. *See Barash*, 26 N.Y.2d at 86 (addressing a "classic case for reformation" alleging an "omitted" oral promise to ensure air flow in a leased building); *Brandwein*, 3 N.Y.2d at 496 (addressing an alleged oral promise about the "vesting" of commissions that was "not inserted in the writing"). This distinction matters given the text in issue here. Again, the License Agreement specifically disclaims "previous oral agreements about" "the matters that this Agreement addresses." Ex. A § 14.5. So perhaps if, as in *Barash* and *Brandwein*, Belkin sought to add something *not specifically addressed*, then its claim could fall outside this disclaimer. Instead, as in *Danann*, Belkin urges a "previous oral agreement[]" falling squarely within the disclaimer.

Third, though *Barash* and *Brandwein* mention mutual mistake in dicta, the plaintiffs in both sought reformation based on fraud. *See Barash*, 26 N.Y.2d at 86 (noting the plaintiff's allegation that "fraudulent representations induced the execution of the lease"); *Brandwein*, 3 N.Y.2d at 496 (noting the plaintiff's allegation that his signature "was procured from him by a fraudulent representation"). The Court of Appeals later held, however, that a party claiming mutual mistake (as opposed to fraud) must show that the parties "reached *an oral agreement* and, unknown to either, the signed writing does not express *that agreement*." *Chimart*, 66 N.Y.2d at 573 (emphasis added). Thus, Belkin cannot deny that a specific disclaimer of oral agreements—unless simply read out of the contract and ignored—destroys the necessary predicate for a mutual-mistake claim. As Powermat explained before, one cannot square an unchallenged disclaimer of "previ-

---

can usually contract around post hoc attempts to change a written contract. *See* Opp. at 9. This results squares with efforts by New York courts to "sharply limit[] the remedy of reformation." *Collins v. Harrison-Bode*, 303 F.3d 429, 435 (2d Cir. 2002). It also squares with New York's "strong public policy favoring freedom of contract." *See 159 MP Corp. v. Redbridge Bedford, LLC*, --- N.E.3d ----, 2019 WL 1995526, at *1 (N.Y. May 7, 2019).

ous oral agreements," *see* Ex. A § 14.5, with an attempt to enforce "an oral agreement" not expressed in the writing, *see Chimart*, 66 N.Y.2d at 573.[5]

In Powermat's cases, by contrast, this Court reached the commonsense conclusion that, under New York law, a party who disclaims oral agreements cannot show mutual mistake using parol evidence of just that. *See* Mem. at 13–14. Belkin's attempt to undercut these cases fails. Belkin first argues that *McEachin* and *Citibank II* are summary-judgment opinions and so "wholly irrelevant" at the pleading stage. *See* Opp. at 9–10. But whether the Court can entertain a mutual-mistake claim based on parol evidence, despite a merger clause, is a *legal* question not dependent on the procedural stage. At the pleading stage, the Court must credit Belkin's factual allegations as *true*, but it can still find allegations about extrinsic matters legally *immaterial*.

Belkin also questions this Court's analysis in *McEachin*, arguing that the Court merely "*assumed* that the contract's integration clause would bar any consideration of parol evidence." Opp. at 10 (emphasis Belkin's). This is wrong. The Court first *held* based on a merger clause that an "email [could not] be considered to vary the terms of the Release." *See McEachin v. Northland Grp., Inc.*, No. 12 Civ. 3283(CM), 2012 WL 6582423, at *8 (S.D.N.Y. Dec. 14, 2012). Only then did it explain, in the alternative, that the email would not show mutual mistake anyway. *See id.* Contrary to Belkin's argument, *McEachin* is directly in-point and decides the parol-evidence issue after spending several paragraphs analyzing New York law. *See id.* at *7–8.

Lastly, Belkin deals with *VoiceAge* and *K.G. Cornwall* by downplaying this Court's reliance on the merger clauses and highlighting other bits of this Court's analyses. *See* Opp. at 10–11. But despite Belkin's protests, this Court's express reliance on the merger clauses in these cas-

---

[5] Belkin also cites three lower- or federal-court cases. *See* Opp. at 9. Aside from not binding this Court, these cases are unpersuasive here for similar reasons. All either call the merger clause in issue "general" (*New York First Avenue*) or describe a more general merger clause than the License Agreement's (*Citibank I* and *Securitized Asset Funding*). Likewise, they all seem to address attempts to supply omitted terms rather than contradict existing terms.

es speaks for itself. *See VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 531 (S.D.N.Y. 2013); *K.G. Cornwall, LLC v. Beazer Homes Corp.*, No. 07 Civ. 2881(CLB), 2008 WL 563466, at *2 (S.D.N.Y. Feb. 28, 2008).

> **B.    Even if the Court considers Belkin's allegations about matters outside the License Agreement, they state no viable reformation claim.**

New York courts make "a heavy presumption that a deliberately prepared and executed instrument manifests the true intention of the parties." *Chimart*, 66 N.Y.2d at 574 (brackets and quotation marks omitted). "The proponent of reformation must show in no uncertain terms, not only that mistake … exists, but exactly what was really agreed upon." *Collins*, 303 F.3d at 435 (quotation marks omitted). A mistake by Belkin alone is not enough. *Id.* Rather, Belkin's well-pleaded factual allegations must show mistake *by both parties* without "contradiction or equivocation." *See Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 797 F. Supp. 2d 254, 275 (S.D.N.Y. 2011) (*Citibank II*) (quotation marks omitted).

Belkin alleges just four facts that, it says, support a plausible inference of mutual mistake. First, Belkin claims that it "approached" Belkin for a PMA license, and the parties never discussed a license to Qi-only devices. Opp. at 6 (citing Dkt. No. 28 ¶ 64). Second, Belkin claims that "Powermat" sent Belkin an email "weeks before" the parties signed the License Agreement suggesting that Powermat offered only a PMA license. *Id.* at 6–7 (citing Dkt. No. 28 ¶ 64). Third, Belkin claims that the License Agreement omits Qi-only chipsets from the definition of Licensed Chipsets. *Id.* at 7 (citing Dkt. No. 28 ¶ 65). And fourth, Belkin claims that Powermat received royalties on just PMA devices for 16 months before it complained. *Id.* (citing Dkt. No. 28 ¶ 66). None of these facts, alone or in combination, comes close to meeting Belkin's burden.

***Belkin's "purpose" and the lack of Qi discussions.*** These allegations are archetypally equivocal. Belkin's alleged "purpose" for "approach[ing]" Powermat cannot raise a plausible in-

ference of mistake *by Powermat*, as Belkin alleges no facts suggesting it told Powermat of its purpose or that Powermat shared that purpose. The alleged lack of specific discussions about a Qi-only license is also equivocal. It is undisputed that the parties exchanged drafts of the License Agreement containing the disputed text. It is also undisputed that the parties discussed at least some terms (like the indemnification and limitation-of-liability terms, as we explain below) and, as Belkin points out, made tracked changes. *See* Opp. at 11. So Belkin could have objected to or otherwise discussed the royalty base spelled out in the License Agreement had it wished to. Powermat's signature shows that Powermat, at the least, intended what is expressed in the License Agreement, and no *lack* of discussions can show otherwise.

**The parties' email chain saying that the license was for "implementing the PMA standard, and nothing more."** Belkin's supposed smoking gun has nothing to do with whether the License Agreement covers, or requires royalties on, Qi-only devices. In deciding Powermat's motion, this Court may consider the email chain itself, *see* Ex. C, since it is integral to Belkin's pleading and Belkin heavily relies on it. *See In re Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 865 F. Supp. 2d 469, 472 (S.D.N.Y. 2012).

The statement cited by Belkin looks very different in context. Kelly Birmingham, Powermat's then-VP of Sales, sent Belkin a draft License Agreement "after our review," responding to an earlier version from Belkin. Ex. C at 3. Pablo Valentin, a Belkin product manager, replied with two comments: one suggesting that limitation-of-liability language "should be struck" and another stating that Belkin wanted indemnification "for non-Powermat PMA intellectual property." *Id.*

18

In response to Valentin's comments, Birmingham said that Powermat provided "nothing more" than a license to Powermat's PMA patents in the context of explaining why Powermat would not indemnify Belkin against third-party infringement claims:

> We cannot ensure there would not be additional IP required for implementing the PMA standard. And since we are not providing a chip or device level product, but only a license to our IP, we cannot provide indemnification for your product and cannot assure that there might not be further IP licensing required for implementation of your product.

*Id.* at 2. Thus, Birmingham was not asked about, and did not address, the license's scope or royalty base. Her "nothing more" remark referred on its face to Powermat's refusal to provide indemnification. And she had no reason to mention the Qi Specification, as Valentin asked only about indemnification for "non-Powermat PMA intellectual property."

This Court has rejected mutual mistake based on emails far more pertinent to the disputed subject. In *Citibank II*, for example, Morgan Stanley sought to reform a credit-default-swap agreement with Citibank to provide that Citibank passed certain voting rights to Morgan Stanley. *See* 797 F. Supp. 2d at 266. This Court reviewed several emails on the exact subject of voting rights passed to Morgan Stanley, both before and after the parties signed the contract. *Id.* at 266–72. Yet it concluded that none "unequivocally" showed that the parties shared Morgan Stanley's alleged understanding. *Id.*; *see also McEachin*, 2012 WL 6582423, at *7–8 (holding than an email from the plaintiff's lawyer stating, "The release will be in favor of AIS and its client, Equable Ascent Financial," could not support reformation of a release to exclude other releasees). Birmingham's email is far more equivocal than the emails in *Citibank II* and *McEachin*.

Lastly, in *Citibank II*, this Court held that even if the emails showed their *authors'* intent, they could not prove mutual mistake absent evidence that anyone else at Citibank meant to grant Morgan Stanley the disputed voting rights. *See* 797 F. Supp. 2d at 274–75. Here too, the email Belkin cites is between Birmingham and Valentin alone. More senior people signed for both

Powermat (its Chief Product Officer) and Belkin (its Director of Product Management). *See* Ex. A, signature page. "It is basic contract law that a person who signs a contract is presumed to know its terms and consents to be bound, and that failure to read a contract is no excuse." *Philippe Nyc I LLC v. Philippe W. Coast, LLC*, No. 14 CIV. 9858 (NRB), 2016 WL 1183669, at *7 (S.D.N.Y. Mar. 24, 2016). Belkin alleges no facts suggesting that the signers, who presumptively understood the written terms, shared any misunderstanding by Birmingham or Valentin.

**The definition of Licensed Chipsets.** As we explained above, the definition of Licensed Chipsets shows no intent to exclude Qi-only devices from the royalty base. Instead, it shows (along with § 5.1) the parties' intent to exclude *PMA devices* from the royalty base when Belkin buys PMA chipsets from a Powermat licensee. *See supra*, Argument § II-C. Thus, the definition of Licensed Chipsets does not create ambiguity, much less suggest mutual mistake.

**The parties' "course of performance."** Nor does Powermat's accepting underpayments for 16 months show mutual mistake. For one thing, course-of-performance evidence must show the parties' conduct for a "considerable length of time." *Stone Key Partners LLC v. Monster Worldwide, Inc.*, 333 F. Supp. 3d 316, 325 (S.D.N.Y. 2018) (quotation marks omitted). "Considerable" may vary with context, but Belkin's cases involved periods of eight years (*Croce*) and five years (*Warberg*). Sixteen months into the License Agreement, Powermat had received just five quarterly payments. *See* Ex. A § 5.2. Thus, even accepting that the Qi Specification "eclipsed" the PMA Specification in early 2017, the timing does not unequivocally show a mistake by Powermat followed by a dispute-driven change in position. It just as well suggests that Powermat needed a few royalty cycles to understand the problem.

Beyond that, Belkin reads too much into Powermat's passive receipt of royalties, especially without any allegation that Powermat knew of the underpayment. *See Gulf Ins. Co. v.*

*Transatlantic Reinsurance Co.*, 69 A.D.3d 71, 86 (N.Y. App. Div. 2009) (observing that course-of-performance evidence must show "the conscious action of a responsible agent of the party against whom the interpretation is urged" (quotation marks omitted)). Belkin's allegation that its Qi-only sales were "public knowledge" shows neither that Powermat knew of those sales nor that it realized Belkin's first few payments excluded royalties on them.[6]

## IV.   Belkin's affirmative defenses do not preclude partial judgment on the pleadings.

Belkin argues that its "waiver, laches, estoppel, unclean hands, and lack of consideration defenses" defeat Powermat's motion. Opp. at 18–19. But a defendant cannot defeat judgment on the pleadings by pointing to unsupported defenses. *See, e.g.*, *28th Highline Assocs., L.L.C. v. Roache*, No. 18 CIV. 1468, 2019 WL 917208, at *8 (S.D.N.Y. Feb. 25, 2019) (granting the plaintiff's motion for judgment on the pleadings where the "[d]efendant's answer, affirmative defenses, and counterclaims do not include factual material to state a 'plausible' claim to relief"). Belkin's affirmative defenses cannot defeat Powermat's motion.

### A.   Powermat did not waive challenges to Belkin's defenses by not raising them in its opening brief.

The Court should reject Belkin's waiver argument. *See* Opp. at 19. Rule 12(c) puts no burden on a plaintiff to preemptively address all pleaded affirmative defenses. And in fact, at the summary-judgment stage, courts "uniformly" require defendants to raise *in their opposition* any defenses they intend to rely on. *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-044 JD, 2018 WL 2328447, at *3 (N.D. Ind. May 22, 2018); *see, e.g.*, *Sunshine Imp & Exp Corp. v.*

---

[6] The Court should reject Belkin's contingent request to replead. *See* Opp. at 11–12. Of Belkin's proposed allegations, the only new fact (as opposed to characterizations of the written contract or parties' contentions) is that the contract negotiations were "rushed." *Id.* Like Belkin's current allegations, this allegation does nothing to "show in no uncertain terms, not only that mistake … exists, but exactly what was really agreed upon." *See Collins*, 303 F.3d at 435. So Belkin has not shown that it could "cure the deficiencies" in its pleading. *See Woodward v. Morgenthau*, 740 F. Supp. 2d 433, 441 (S.D.N.Y. 2010).

*Luxury Car Concierge, Inc.*, No. 13 C 8925, 2015 WL 2193808, at \*3–4 (N.D. Ill. May 7, 2015). Courts cite two rationales. First, by seeking judgment on its claim, a plaintiff implicitly contests the existence of factual disputes material to any affirmative defense. *United Cent. Bank v. Wells St. Apartments, LLC*, 957 F. Supp. 2d 978, 987–88 (E.D. Wis. 2013); *Sunshine*, 2015 WL 2193808, at \*3. Second, "it would be wasteful to require a plaintiff to include in its summary-judgment opening brief an argument directed to every affirmative defense that the defendant may have listed in its answer," including ones the defendant may have "never intended to litigate." *United Cent.*, 957 F. Supp. 2d at 988.

These same rationales apply to a Rule 12(c) motion. It makes sense and would preserve judicial economy to make Belkin "identify and argue those defenses that matter" in its response. *See Sunshine*, 2015 WL 2193808, at \*4. This case illustrates the point: Belkin seems to jettison its lack-of-consideration defense, for example, as its brief offers no discussion or argument on that defense. (Powermat addresses it below anyway.) Belkin's cases do not hold otherwise but state only the general rule that a party waives issues raised for the first time in reply. *See* Opp. at 19. Belkin also says it will "have no opportunity to respond" to Powermat's arguments, *see id.*, but it could seek leave to do so.

### B.   Belkin's equitable defenses of waiver, laches, estoppel, and unclean hands do not apply to Powermat's damages claim.

Belkin's waiver, laches, estoppel, and unclean-hands defenses are immaterial because they would bar only *equitable relief*, not liability or damages. *See Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 310 (S.D.N.Y. 2010) ("Laches cannot be a defense to a legal action for damages if the action was commenced within the statute of limitations period."); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461, 477 (S.D.N.Y. 2005) ("[U]nclean hands is an equitable defense that does not apply to ac-

tions at law that seek money damages."); *Horvath v. High Peaks Sand, Gravel & Minerals, LLC*, No. 904568-16, 2018 WL 3973426, at *4 (N.Y. Sup. Ct. Aug. 1, 2018) ("The equitable defenses of waiver and estoppel … and unclean hands … are inapplicable to this action at law seeking the recovery of money damages." (collecting cases)).

###### C.    Belkin pleads insufficient facts to sustain its affirmative defenses.

Belkin asserts waiver, laches, estoppel, and unclean-hands based solely on Powermat's alleged "statements and conduct before executing the contract and during the first 16 months of the contractual term." Dkt. No. 28 ¶¶ 58–59. Its brief provides a bit more color, pointing to Powermat's alleged "16-month delay in seeking royalties from Belkin on Qi-only devices." Dkt. No. 44 at 18. Even accepting this delay allegation, however, it is not enough to sustain these defenses. Belkin also pleads no viable lack-of-consideration theory.

*Waiver.* "The affirmative defense of waiver applies only if the plaintiff intentionally and knowingly waived its right to recovery." *Maxim*, 690 F. Supp. 2d at 310 (quotation marks omitted). Waiver "may not be inferred from mere silence or inaction." *J & J Sports Prods., Inc. v. Patin*, 358 F. Supp. 3d 318, 323 (S.D.N.Y. 2019) (quotation marks omitted). Belkin pleads no facts showing an intentional and knowing waiver by Powermat of its right to royalties on Qi products. At most, it claims 16 months of inaction, which is not enough. Separately, the License Agreement bars Belkin's waiver defense by prohibiting any waiver except by signed writing. Ex. A § 14.8. "Where, as here, the contract contains a no waiver provision … , any waiver by either party must be in writing." *Maxim*, 690 F. Supp. 2d at 310.

*Laches.* "Laches is a defense developed by courts of equity to protect defendants against unreasonable, prejudicial delay in commencing suit." *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 960 (2017). It requires Belkin to show (1) that Powermat was aware of its claim; (2) that Powermat inexcusably delayed in asserting it; and (3) that

Belkin was prejudiced. *See Bakalar v. Vavra*, 819 F. Supp. 2d 293, 303 (S.D.N.Y. 2011). Belkin pleads none of these elements. It does not claim that Powermat realized during the alleged 16-month delay that Belkin was not paying royalties on Qi-only products. Nor does it plead facts showing that the alleged delay was either unreasonable or inexcusable. Nor does it plead prejudice.

*Estoppel.* Equitable estoppel requires Belkin to show (1) acts constituting misrepresentation or concealment of facts; (2) an intention or expectation that Belkin rely those acts; (3) Powermat's knowledge of the true facts; and (4) Belkin's detrimental reliance. *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 714 (S.D.N.Y. 2012). Here again, Belkin pleads none of these elements: it claims no intentional misrepresentation or concealment by Powermat, much less reliance by or harm to Belkin.

*Unclean hands.* Belkin's unclean-hands defense fails for two reasons. First, "the doctrine of unclean hands requires the defendant to prove that (1) the plaintiff is guilty of immoral, unconscionable conduct; (2) the conduct was relied upon by the defendant; and (3) the defendant was injured thereby." *Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 338 n.31 (S.D.N.Y. 2010). As with laches and estoppel, Belkin pleads none of these elements. Second, to show unclean hands, Belkin must show that Powermat engaged in "the same behavior [Powermat] accuses [Belkin] of conducting." *See Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 646 (S.D.N.Y. 2018). Belkin cannot meet this requirement because the conduct it alleges (delay) is different from the conduct Powermat alleges (failure to pay royalties). *See id.*

*Lack of consideration.* Belkin's lack-of-consideration defense fails for two reasons. First, Belkin pleads no facts whatsoever showing a lack of consideration. *See* Dkt. No. 28 ¶ 60; *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 270 (2d Cir. 1996) ("Affirmative de-

fenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy." (brackets and quotation marks omitted)).

Second, Belkin states no viable theory. Consideration requires only that the parties exchanged "something of real value in the eye of the law." *Apfel v. Prudential-Bache Securities Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993) (quotation marks omitted). And "if there is consideration for the entire agreement[,] that is sufficient; the consideration supports every other obligation in the agreement." *Trilegiant Corp. v. Orbitz, LLC*, 993 N.Y.S.2d 462, 464 (N.Y. Sup. Ct. 2014) (brackets and quotation marks omitted). Belkin does not dispute that it received value under the License Agreement, including a license to Powermat's IP. It instead claims lack of consideration only "with respect to" its obligation to pay royalties on Qi-only products. *See* Dkt. No. 28 ¶ 60. That is not how consideration works. The undisputed "consideration for the entire agreement" supports Belkin's entire royalty obligation. *See Trilegiant*, 993 N.Y.S.2d at 464.

## CONCLUSION

This Court should (1) grant Powermat's motion and enter judgment of liability on the pleadings; and (2) deny Belkin's cross-motion, holding that the License Agreement's limitation-of-liability clause does not limit Powermat's claimed damages.

July 12, 2019                                    Respectfully submitted,


                                                  */s/ Kenneth H. Frenchman*
                                                 Kenneth H. Frenchman
                                                 NY State Bar No. 3028115
                                                 **McKool Smith, PC**
                                                 One Bryant Park, 47th Floor
                                                 New York, NY 10036
                                                 T: 212.402.9400
                                                 F: 212.402.9444

                                                 Mike McKool (admitted *PHV*)
                                                 mmckool@mckoolsmith.com
                                                 Nicholas Mathews (admitted *PHV*)
                                                 nmathews@mckoolsmith.com
                                                 Rudy Fink (admitted *PHV*)
                                                 rfink@mckoolsmith.com
                                                 **McKool Smith, PC**
                                                 300 Crescent Court, Suite 1500
                                                 Dallas, TX 75201
                                                 T: 214.978.4000
                                                 F: 214.978.4044

                                                 Charles E. Fowler, Jr. (admitted *PHV*)
                                                 cfowler@mckoolsmith.com
                                                 **McKool Smith, PC**
                                                 300 W. 6th Street, Suite 1700
                                                 Austin, TX 78701
                                                 T: 512.692.8700
                                                 F: 512.692.8744

                                                 **ATTORNEYS FOR PLAINTIFF
                                                 POWERMAT TECHNOLOGIES,
                                                 LTD.**

26

## CERTIFICATE OF SERVICE

I certify that, on July 12, 2019, I filed this document with the Court's ECF system, which will serve all counsel of record via email.

*/s/ Charles E. Fowler, Jr.*
Charles E. Fowler, Jr.
