UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

POWERMAT TECHNOLOGIES, LTD.,

    Plaintiff,

v.

BELKIN INTERNATIONAL, INC.,

    Defendant.

Case No. 1:19-cv-878-VSB

**DEFENDANT BELKIN INTERNATIONAL, INC.'S
REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>CROSS-MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS</u>**

## TABLE OF CONTENTS

    **Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ......................................................................................................................... 1

    I.    Section 13 Limits the Parties' Liability for Legal Claims in Connection With the License Agreement. ........................................................................... 1

    II.    Applying Section 13 to Legal Claims Would Not Negate Any Other Contractual Term. ........................................................................................... 3

    III.    Powermat's Argument that Section 13 Does Not Apply to Legal Claims Seeking Direct Damages Is Contrary to New York Law. ................................. 6

    IV.    Powermat's Interpretation of Section 13 Would Negate the Agreed-Upon Damages Cap and Defeat the Parties' Reasonable Expectations. ..................... 9

CONCLUSION ...................................................................................................................... 10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Electron Trading LLC v. Morgan Stanley & Co. LLC*,
  2017 WL 1479483 (N.Y. Sup. Ct. Apr. 25, 2017) ............................................................. 4, 5, 6

*Electron Trading, LLC v. Morgan Stanley & Co. LLC*,
  69 N.Y.S.3d 633 (N.Y. App. Div. 2018) ................................................................................. 5

*Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*,
  343 F. Supp. 3d 789 (N.D. Ill. 2018) ...................................................................................... 8

*Muttontown Pictures, Inc. v. Levine*,
  370 N.Y.S.2d 62 (1975) ....................................................................................................... 8, 9

*Myplaycity, Inc. v. Conduit Ltd.*,
  2011 WL 3273487 (S.D.N.Y. July 29, 2011) ................................................................. 7, 9, 10

*Process America, Inc. v. Cynergy Holdings, LLC*,
  839 F.3d 125 (2d Cir. 2016) .......................................................................................... 1, 4, 7, 10

*Tractebel Energy Mktg. v. AEP Power Mktg.*,
  487 F.3d 89 (2d Cir. 2007) ...................................................................................................... 6

*Tradex Europe SPRL v. Conair Corp.*,
  2008 WL 1990464 (S.D.N.Y. May 7, 2008) ........................................................................ 6, 7

**Other Authorities**

Meriam-Webster Dictionary, definition of "total" as adjective (emphasis added),
  available at:  https://www.merriam-webster.com/dictionary/total ........................................... 6

## INTRODUCTION

Section 13's limitation-of-liability provision is neither unique nor ambiguous. It prohibits the recovery of consequential damages and limits each party's direct damages to the amount of royalties paid in the twelve months preceding the non-breaching party's claim. New York courts, including the Second Circuit, have routinely enforced limitation-of-liability provisions with the same structure and equivalent language. *See, e.g.*, *Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125 (2d Cir. 2016). In fact, Powermat *does not cite a single case*, from any jurisdiction, in which a court refused to enforce a similar provision or found it ambiguous. Powermat instead raises a series of textual arguments, each of which is intended to show that Section 13 does not mean what it says. None of those argument has merit.

## ARGUMENT

**I.    Section 13 Limits the Parties' Liability for Legal Claims in Connection With the License Agreement.**

Powermat contends that the "[u]npaid royalties" it seeks to recover as damages for Belkin's alleged breach of the License Agreement "are not a 'claim' under § 13, but an 'underpayment' of 'royalties' that must be 'settled' under § 9." (Opp. at 2.[1]) But that assertion is refuted by the License Agreement's plain language.

For starters, Section 13 and Section 9 address two different situations. Section 13, entitled "LIMITATION OF LIABILITY," addresses the situation in which a legal dispute has arisen between the parties. It provides that "neither party will have liability for any indirect, incidental, consequential, special or punitive damages in connection with this agreement, regardless of the theory of liability," and that "each party's total liability under this agreement

---

[1] "Opp." refers to Powermat's Combined (1) Memorandum Opposing Belkin's Cross-Motion for Partial Judgment on the Pleadings & (2) Reply Memorandum Supporting Powermat's Motion for Partial Judgment on the Pleadings (Dkt. No. 47).

shall not exceed the total amount of fees paid by [Belkin] to Powermat over the twelve months immediately preceding the date for which the claim was made." (Lic. Agmt. § 13.) In this context, the term "claim" is plainly referring to a legal claim for damages. That is the only interpretation that makes sense given the parties' stated intent to waive indirect and consequential damages and cap their "total liability" for any "claim" asserted by the other party. That interpretation is also buttressed by Section 8, in which Belkin agreed that it would not "file a complaint or similar pleading to institute a *claim* . . . seeking a declaratory judgment or similar relief that any Licensed Patent is invalid." (*Id.* § 8 (emphasis added).) This demonstrates that the parties understood the term "claim" to mean a legal claim asserted in a "complaint or similar pleading," and nothing in Section 13 suggests a different meaning.

By contrast, Section 9, entitled "RECORDS; AUDIT RIGHTS," addresses the situation in which, during the ordinary course of business, an audit of Belkin's records reveals that it has "underpaid royalties due [] by more than five percent (5%)," in which case, Belkin must "settle" any overdue amount within 30 days and reimburse Powermat its "reasonable out-of-pocket costs [] incurred in connection with such audit." (Lic. Agmt. ¶ 9.) Section 9, however, does not address a situation, like that presented here, in which (i) there has been *no audit* of Belkin's records (*see* Compl. at 2 (alleging that Belkin has "failed to comply with the Agreement's reporting and auditing provisions")), and (ii) one party is asserting a legal claim for *damages* arising from an alleged breach of the agreement. Legal claims are governed by Section 13.

Moreover, even assuming that Belkin's refusal to pay royalties on Qi-only products was an "underpayment" for purposes of Section 9, that would not permit Powermat to avoid Section 13's limitation of liability. To the extent Belkin owed additional royalties (which it denies) and failed to "settle" that debt within 30 days as required by Section 9, Powermat's

2

remedy would be to assert a breach-of-contract claim, as it has done here, *which leads right back to Section 13*. Indeed, the Complaint makes clear that Powermat seeks unpaid royalties as *damages* for Belkin's alleged breach of contract. (*See* Compl. ¶¶ 58(A), (F).) Those damages are limited by Section 13, regardless of what Section 9 required before the alleged breach.

While Powermat also points to Sections 5 and 7 to support its argument that Section 13 does not apply here, those sections merely set forth Belkin's substantive obligations to pay royalties on a quarterly basis and submit quarterly reports. (*See* Lic. Agmt. §§ 5, 7.) Like Section 9, they do not address legal disputes or the damages available in the event of a breach. Powermat's observation that "[t]he word 'claim' is nowhere in the[se] sections" is therefore unsurprising. (Opp. at 3.) The word "claim" appears exactly where expected: in Section 13, because that is the section limiting each party's liability for *legal claims*.[2]

## II. Applying Section 13 to Legal Claims Would Not Negate Any Other Contractual Term.

Unable to identify any ambiguity in Section 13 itself, Powermat argues that the Court must "harmonize" Section 13 with Sections 5, 7, and 9 (presumably by ignoring Section 13) because, in Powermat's view, those sections would be "meaningless if Powermat's right to collect unpaid royalties . . . were capped at whatever Belkin had voluntarily paid Powermat over the past year." (Opp. at 4-5.) But applying Section 13 as written would not negate those sections or any other contractual term. As described above, Sections 5, 7, and 9 address the parties' substantive rights and obligations in the *normal course of business* under the contract (for example, where an audit reveals an inadvertent reporting error that the parties agree to

---

[2] Powermat's reliance on a grab-bag of other contractual terms fares no better. (*See* Opp. at 5-6 (describing License Agreement's five-year term, termination provision, patent license, technology license, right to register products, and right to sell off products after expiration).) Like Sections 5 and 7, none of those provisions conflicts with Section 13 or says anything about damages in the event of a breach. They are standard contractual terms that would be expected in any license agreement, and they fall far short of establishing that Section 13 does not mean what it says.

correct).  (*See* Lic. Agmt. §§ 5, 7, 9.)  Section 13, by contrast, addresses *damages* in the event of a *legal dispute* between the parties.  (*Id.* § 13.)  There is no conflict between these provisions, and the New York courts have rejected similar efforts to manufacture one.

In *Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125 (2d Cir. 2016), for example, the Second Circuit addressed a provision stating that "the total cumulative liability of [defendant] in the aggregate for damages arising from any breach of this Agreement . . . shall not exceed . . . [the] fees derived by [the defendant] . . . during the last 4 months of this Agreement." *Id.* at 137.  The plaintiff argued that reading this provision to limit the defendant's liability for breach would render "superfluous" another provision entitling the plaintiff to continue receiving residuals.  *Id.*  The court rejected that argument, finding that the residuals provision "says nothing about damages" and thus "[t]here is no contradiction between the two provisions" and "no need to 'harmonize' them, which, in [plaintiff's] view, would require us to simply ignore [the damages cap]." *Id.* at 138.  The court also found that while "the interplay between th[e] two provisions [] give[s] [the defendant] an incentive to stop paying residuals where the payments owed would exceed the damages cap," that was "*the contract that the parties bargained for*." *Id.* (emphasis added).  An identical result is warranted here:  Sections 5, 7, and 9 say nothing about damages; there is no need to "harmonize" them with Section 13; and Powermat's belated complaints about the perverse incentives created by Section 13 (*see* Opp. at 6-7) cannot relieve it from the bargain it struck with Belkin.

*Electron Trading LLC v. Morgan Stanley & Co. LLC*, 2017 WL 1479483 (N.Y. Sup. Ct. Apr. 25, 2017), is also instructive.  There the court rejected plaintiff's argument that enforcing a limitation-of-liability provision closely similar to the one at issue here would negate the contract's substantive terms and render it illusory because the defendant could "breach the

4

[contract], prior to making any payment, leaving [plaintiff] without a remedy." *Id.* at *3-4. The court explained that:

> [m]erely because [plaintiff] is able to construct a hypothetical scenario under which its damages might be de minimus, that does not make the ELA an illusory contract. The parties operated under the relevant agreements for almost seven months prior to [defendant's] alleged breach and during that time, [plaintiff] received significant monetary compensation from [defendant].

*Id.* at *4. The same is true here. It is undisputed that Belkin paid royalties for *16 months* before Powermat raised any issue about Qi-only products. At that point, Powermat had a damages claim under Section 13 if it could prove that Belkin breached by refusing to pay royalties on Qi-only products (a theory which Belkin denies). Powermat is simply dissatisfied with the *amount* of damages that it may recover under the limitation of liability for which it bargained.

While Powermat tries to downplay the significance of *Electron Trading* by characterizing it as a "state trial-court case" (Opp. at 7), the Appellate Division affirmed, explaining:

> New York courts routinely enforce such liability-limitation provisions, especially when negotiated by sophisticated parties. The Court of Appeals has recognized that "[a] limitation on liability provision . . . represents the parties' Agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor. . . . [The parties] may later regret their assumption of the risks of non-performance in this manner, but the courts let them lie on the bed they made."

*Electron Trading, LLC v. Morgan Stanley & Co. LLC*, 69 N.Y.S.3d 633, 635 (N.Y. App. Div. 2018) (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l,* 643 N.E.2d 504 (N.Y. 1994)). Those observations are particularly apt here. Belkin believes that it performed fully under the License Agreement, but to the extent it did not, the attendant cap on Belkin's liability was a risk of which Powermat was undeniably aware, and knowingly assumed, when it proposed and agreed to Section 13's broad limitation of liability. *See Tradex Europe SPRL v. Conair Corp.*, 2008 WL

5

1990464, at *1, *2 n.2 (S.D.N.Y. May 7, 2008) (enforcing limitation-of-liability provision with language closely similar to License Agreement).

### III. Powermat's Argument that Section 13 Does Not Apply to Legal Claims Seeking Direct Damages Is Contrary to New York Law.

Powermat attempts to distinguish Belkin's authorities, including *Electron Trading*, on the ground that the plaintiffs there "did not seek to recover *amounts due and payable* under the contract," but instead sought damages for the defendants' failure to perform other contractual obligations. (Opp. at 8 (emphasis added).) But Powermat *does not cite a single case* suggesting that "amounts due and payable" under a contract are excluded from limitation-of-liability provisions generally, let alone from a provision capping each party's "total liability." (Lic. Agmt. § 13.) "Total," of course, is typically defined as "comprising or constituting *a whole*."[3] Section 13 therefore makes clear on its face that it does not exclude any subset of damages. Had the parties intended to do so, they "could have drafted the contract to express that meaning," but instead "the parties drafted a broad limitation of liability provision" that caps their total liability. *See Electron Trading*, 2017 WL 1479483, at *3

Moreover, taken to its logical conclusion, Powermat's argument would mean that contractual counterparties could never limit the recovery of direct/general damages—*i.e.*, money "due and payable" under a contract. *See, e.g., Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 109 (2d Cir. 2007) ("when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages"). But that is plainly not the law. New York courts routinely enforce damages caps limiting the recovery of direct/general damages—including "amounts due and payable" under a contract.

---

[3] Meriam-Webster Dictionary, definition of "total" as adjective (emphasis added), *available at*: https://www.merriam-webster.com/dictionary/total.

6

*Myplaycity, Inc. v. Conduit Ltd.*, 2011 WL 3273487 (S.D.N.Y. July 29, 2011), is directly on point.  Plaintiff there, an internet company that created a toolbar for web browsers, alleged that defendant breached the parties' revenue sharing agreement by, among other things, failing to pay plaintiff "its share of the revenue" accrued from distributing the toolbar.  *Id.* at *1-2.  The agreement contained a limitation-of-liability provision with a structure identical to the one presented here:  the first sentence barred the recovery of consequential or indirect damages, and the second sentence capped each party's "aggregate liability" at $5,000.  *Id.* at *5-6.  In finding the provision unambiguous and enforceable, the court rejected plaintiff's argument that the damages cap applied "only to the damages enumerated in the first sentence," reasoning that the term "aggregate liability" included *all* damages and was not "coextensive with the categories of damages listed in the first sentence."  *Id.* at *6.  Accordingly, the court held that plaintiff's total potential recovery on *all* claims—*including its claim for accrued but unpaid revenues*—was capped at $5,000.  *Id.* at *8.  In other words, the court recognized no exception of the sort Powermat posits for "amounts due and payable" under the contract.

Likewise, in *Tradex Europe SPRL*, 2008 WL 1990464, the court enforced a limitation-of-liability provision that limited each party's recovery to "actual direct damages" in "an amount not to exceed the total [commissions] paid to [plaintiffs] . . . during the twelve month period prior to the date the first cause of action hereunder arose."  *Id.* at *1, 6.  Not only was there no suggestion that New York law prohibits direct-damages caps, but the court enforced the cap notwithstanding the fact that it precluded plaintiff from recovering *any* damages, since no commissions had been paid.  *Id.* at *2 n.2*; see also Process Am., Inc.*, 839 F.3d at 137 (enforcing limitation-of-liability provisions that limited "total cumulative liability" to "fees derived . . . during the last 4 months," without distinguishing between direct and indirect damages).

7

The handful of authorities that Powermat does cite are inapposite and lend no support to its "amounts due and payable" theory. Powermat relies primarily on *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 343 F. Supp. 3d 789, 801-05 (N.D. Ill. 2018) (*see* Opp. at 4–5), an Illinois decision in which the court addressed an *entirely different issue*: whether the profits that plaintiff allegedly lost when defendant failed to pay royalties were consequential or direct damages under a contract containing a consequential-damages waiver (but no direct-damages cap). While the court concluded that plaintiff's lost royalties were direct damages, and thus outside the scope of the consequential-damages waiver, *see id.*, that bears no relevance to the question presented here: whether the License Agreement's *direct-damages cap*—framed as "total liability"—is enforceable under New York law. Nowhere does *Elorac* address that issue or suggest that a direct-damages cap does not apply to "amounts due and payable" under a contract. If anything, *Elorac* merely confirms that Powermat's lost royalties *are* direct damages falling squarely within Section 13.[4]

Powermat's reliance on *Muttontown Pictures, Inc. v. Levine*, 370 N.Y.S.2d 62, 63-64 (1975), is similarly misplaced. The contract at issue there gave the defendant the right to distribute and license a movie at its discretion, but obligated the defendant to spend at least $200,000 doing so. *Id.* The court held that while the defendant had discretion in *how* to "publicize and exploit" the movie, the defendant could not forego spending the requisite $200,000. *Id.* The case has no connection to the facts here, and there was no limitation-of-

---

[4] While Powermat relies on the *Elorac* court's observation that the contract's auditing and termination provisions would be "essentially meaningless if a party breaching them is not liable for [lost royalties] as general damages," that was only true because the contract contained a consequential damages *waiver* and would therefore "carry no possibility of sanction" if the lost royalties were consequential damages. 343 F. Supp. 3d at 804. The court did not address a situation, like that presented here, where the contract provides a legal remedy for breach of the royalty, auditing, and termination provisions, subject to an agreed-upon *damages cap*. That is a material difference because no contractual provision is meaningless if there is a damages remedy for breaching it, even if subject to a cap.

liability provision at issue. The court merely held that it must "give[] meaning to every provision of a contract," *id.*, which is exactly what Belkin is asking the Court to do here.

## IV. Powermat's Interpretation of Section 13 Would Negate the Agreed-Upon Damages Cap and Defeat the Parties' Reasonable Expectations.

As a fallback argument, Powermat contends that applying Section 13 as written would "defy the parties' obvious expectations and purpose" because "Belkin could eliminate any outstanding balance simply by not paying Powermat anything for a year" or "vastly reduce its balance by making only token payments." (Opp. at 6.) Powermat is wrong for several reasons.

First, the parties' "expectations and purpose" are clear from the unambiguous language they used in Section 13. Powermat proposed that language and knowingly assumed the risk that if Belkin failed to perform, Belkin's "total liability" would be capped at the amount it had paid in royalties during the preceding 12 months. (Lic. Agmt. § 13.) Powermat could have no other expectation and cannot rewrite the contract now merely because it is no longer happy with the bargain it struck. *See Myplaycity, Inc.*, 2011 WL 3273487, at *6 ("[I]t is not the Court's role to rewrite an unambiguous contract because it turned out poorly for one side.").

Second, Powermat's flawed interpretation of the License Agreement would render the second sentence of Section 13 superfluous. Indeed, if Powermat could recover "amounts due and payable" under the contract—*i.e.*, direct/general damages—without limitation, then the second sentence's cap on each party's "total liability" would have no meaning, as the first sentence already bars Powermat from recovering "any indirect, incidental, consequential, special, or punitive damages." (Lic. Agmt. § 13.) The only damages left to cap are the direct/general damages that Powermat seeks here. *See Myplaycity, Inc.*, 2011 WL 3273487, at *6 ("[Plaintiff's] reading of the limitations provision is nonsensical, as it would require the Court to

conclude that [defendant's] liability for the categories of damages listed in the first sentence is simultaneously limited to zero and $5,000.").

Third, Powermat's hypotheticals (Opp. at 6-7) are both counterfactual and misleading. It is undisputed that Belkin paid royalties for 16 months under the License Agreement, so Powermat *always* had a viable damages remedy and Belkin's obligation to pay royalties was *never* "optional." (*Id.* at 7.)  Nor could Belkin have "eliminate[d] any outstanding balance simply by not paying Powermat anything for a year" or "reduce[d] its balance by making only token payments." (*Id.* at 6.)  If Belkin had failed to pay on time or in full, Powermat could have immediately asserted a breach-of-contract claim and, under Section 13, recovered damages up to the amount of fees that Belkin had paid over the preceding 12 months. (*See* Lic. Agmt. § 13.) Powermat could also have terminated the agreement and Belkin's license. (*See id.* § 10.2.)

Finally, while Powermat argues that under Belkin's interpretation of Section 13, "[t]he amount of protection [Belkin would] receive[] from the limitation-of-liability clause would increase with the severity of its own breach" (Opp. at 6), that is true for *all* limitation-of-liability provisions, which, by definition, limit a party's liability without regard to the severity of the breach or the resulting damages.  That does not mean Section 13 is unenforceable.  *See Process Am., Inc.*, 839 F.3d at 138 ("New York courts have routinely enforced liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed.").

## CONCLUSION

For the foregoing reasons, the Court should grant Belkin's cross-motion for partial judgment on the pleadings and dismiss Plaintiff's breach-of-contract claim to the extent it seeks damages beyond what Belkin paid to Powermat in the 12 months preceding the date on which Powermat asserted its claim for breach of contract. (*See* Lic. Agmt. § 13.)

Dated:   August 2, 2019                                        Respectfully submitted,

By: /s/ *Andrew J. Frackman*

Andrew J. Frackman
Brad M. Elias
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel: (212) 326-2000
Fax: (212) 326-2061
Email: afrackman@omm.com
Email: belias@omm.com

Ryan K. Yagura
(*admitted pro hac vice*)
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
Tel: (213) 430-6000
Fax: (213) 430-6407
Email: ryagura@omm.com

Matt Kline
(*admitted pro hac vice*)
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Office: (310) 553-6700
Fax: (310) 246-6779
Email: mkline@omm.com

*Counsel for Defendant Belkin International, Inc.*