UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                          :

POWERMAT TECHNOLOGIES, LTD.,     :
                          :

                    Plaintiffs,    :

                          :

         - against -        :

                          :

BELKIN INTERNATIONAL INC.,      :

                          :

                  Defendant.    :

                          :
-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___4/2/2020___

19-CV-878 (VSB)

**SEALED OPINION & ORDER**

<u>Appearances</u>:

Charles E. Fowler
Erik B. Fountain
Mike McKool, Jr.
Nicholas M. Mathews
Rudolph Fink, IV
Kenneth H. Frenchman
McKool Smith
Austin, TX, Dallas, TX, and New York, NY
*Counsel for Plaintiff*

Andrew J. Frackman
Matthew Kline
Ryan K. Yagura
Brad M. Elias
O'Melveny & Myers LLP
New York, NY and Los Angeles, CA
*Counsel for Defendant*

<u>VERNON S. BRODERICK, United States District Judge</u>:

       Powermat Technologies, Ltd. ("Powermat") brings this action for breach of contract

against Belkin International ("Belkin"), who in turn asserts counterclaims of reformation and

breach of the implied covenant of good faith and fair dealing.  Before me are:  (1) Powermat's

motion for partial judgment of liability in its favor and against Belkin; (2) Belkin's cross-motion

for partial judgment on the pleadings establishing that any liability on its part is limited by the contract; (3) Belkin's motion to strike a portion of Powermat's reply brief; (4) Belkin's motion for leave to file an amended answer and counterclaims; (5) Belkin's request to file various materials under seal; and (6) four substantive discovery disputes.  Because Belkin's proposed amendments will not cause undue delay or prejudice, and are not futile, Belkin's motion for leave to amend its answer and counterclaims is GRANTED.  Because Belkin has adequately pled its reformation counterclaim and affirmative defense of mutual mistake, there are significant issues of fact as to Powermat's breach of contract claim and its motion for judgment of liability on the pleadings is DENIED.  Because I do need to reach the merits of Belkin's remaining affirmative defenses, Belkin's motion to strike the relevant portion of Powermat's reply brief is DENIED as moot.  Because as a matter of law the License Agreement limits either party's liability for a legal claim to the amount of fees paid by Belkin to Powermat in the 12 months prior to that claim being made, Belkin's cross-motion for judgment on the pleadings is GRANTED.

Because the parties have not justified the extensive proposed redactions, Belkin's requests to file materials under seal is held in abeyance at this time, pending Belkin's submission of a letter setting forth the basis for the requested redactions.  Because my rulings here may affect the parties' positions on the various discovery issues they have raised, their requests are DENIED without prejudice to renewal after they have had the opportunity to meet and confer concerning the impact of this Opinion & Order on those discovery issues.

I.      **Factual Background**[1]

Powermat is an Israeli corporation that has developed wireless charging technology that allows devices to be charged without being plugged into a power cord.  (Compl. ¶ 1, 6–7.)[2]  This technology "works by having a transmitter that wirelessly sends power to a receiver."  (*Id.* ¶ 8.)  To enable interoperability among devices and accessories, organizations developing industry standards have published wireless charging specification standards.  (*Id.* ¶¶ 12–13.)  These standards incorporate technologies patented by various industry participants, and where "a standard cannot be implemented without practicing a particular patent, that patent is deemed 'essential' to that standard."  (*Id.* ¶ 14.)  Two such standards, also referred to by the parties as specifications, are the Power Matters Alliance ("PMA") standard and the Qi standard.  (Belkin Am. Ans. ¶ 63.)[3]

Belkin is a manufacturer of accessories for electronic devices that began selling wireless chargers in 2015.  (*Id.* ¶¶ 16, 18.)  On November 3, 2015, Powermat and Belkin entered into a licensing agreement for the use of certain patents to implement certain wireless charging standards, (the "License Agreement").  (*Id.* ¶ 19–21; License Agmt.)[4]  Under the License Agreement, Powermat agreed to provide Belkin with a license to the "Licensed Patents" to use in the production and distribution of "Licensed Products."  (License Agmt. § 2.1.)  Belkin agreed to

---

[1] The facts set forth herein are taken from the allegations contained in Powermat's Complaint, (Doc. 6), and Defendant's Proposed Amended Answer and Counterclaims, (Doc. 72-1 (under seal).)  They are intended as background only; my reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "Compl." refers to Powermat's Complaint, filed on January 30, 2019.  (Doc. 6.)

[3] "Belkin Am. Ans." refers to Belkin's proposed Amended Answer and Counterclaims, filed under seal on December 20, 2019, as Exhibit 1, (Doc. 72-1), to Defendant Belkin International, Inc.'s Memorandum of Law in Support of its Motion for Leave to File an Amended Answer and Counterclaims, (Doc. 72).

[4] "License Agmt." refers to the License Agreement, filed on May 23, 2019 as Exhibit A, (Doc. 39-1), to the Declaration of Charles E. Fowler, Jr., (Doc. 39).

pay, on a quarterly basis, a running royalty on "all Licensed Products" it sold.  (*Id.* § 5.1, 5.2.)
The License Agreement included an Exhibit A, entitled "Definitions," in which "Licensed
Products" is defined as "Licensed Chipsets, Licensed Receivers, and Licensed Transmitters."
(*Id.* Ex. A § 6.)  A Licensed Receiver is defined as a "product that (a) incorporates an inductive
charging receiver(s) (and related components) that can be charged by Licensed Transmitters, and
(b) is intended to be compliant or compatible with the PMA Specification or Qi Specification or
both the PMA Specification and Qi Specification."  (*Id.* Ex. A § 7.)  A "Licensed Transmitter" is
similarly defined as a transmitter that is "intended to be compliant or compatible with the PMA
Specification or Qi Specification or both the PMA Specification and Qi Specification."  (*Id.* Ex.
A § 8.)  "Licensed Chipset," however, is defined as a chipset that "implements elements of the
PMA Specification or both the PMA Specification and the Qi Specification," and that when
"joined with other components, becomes a Licensed Receiver or Licensed Transmitter."  (*Id.* Ex.
A. § 4.)  The License Agreement's opening whereas-clauses also mention both the PMA
Specification and the Qi Specification.  (*Id.* at 1.)

The License Agreement also (1) grants Powermat the right to audit Belkin's records once
every 12-month period and demand settlement of any under- or over-payment of royalties, (*id.* §
9); (2) sets a contract term of five years unless terminated early for certain specified reasons,
such as breach, (*id.* § 10); (3) contains warranties and disclaimers, (*id.* § 12); (4) includes an
integration and disclaimer of prior agreements clause, (*id.* § 14.5); and (5) includes a clause that
limits "each [p]arty's total liability under [the License Agreement] . . . . [to] the total amount of
fees paid by Licensee to Powermat over the twelve months immediately preceding the date for
which the claim was made," (the "Limitation of Liability Clause"), (*id.* § 13).

Upon execution of the License Agreement and for over sixteen months thereafter, Belkin

4

alleges, it paid quarterly royalties on its wireless charging device that employed both the PMA and Qi specifications, known as a dual-mode wireless charging device.  (*Id.* ¶ 75.)  Although Belkin sold a Qi-only wireless charging device, which Belkin alleges Powermat knew, Belkin did not report sales or pay royalties on it, believing that it was not covered by the License Agreement.  (*Id.*)  In 2017, Powermat alleges, it "discovered that Belkin had not paid all the royalties it had agreed to under the Agreement," (Compl. ¶ 35), namely, royalties from its sales of the Qi-only wireless charging device, which Powermat believes are subject to the License Agreement, (*see* Powermat Ans. ¶¶ 66, 82; Powermat Mem. J. Pl. 15.)[5]

Powermat alleges that it raised this issue with Belkin in March 2017, and that after several communications, Belkin unilaterally and ineffectively terminated the License Agreement on November 28, 2017.  (Compl. ¶¶ 35–39.)  According to Powermat, Belkin did not pay any royalties throughout 2018, (Compl. ¶ 41), and on December 28, 2018, Powermat made a request for an audit pursuant to the License Agreement, which Belkin refused, (*id.* ¶¶ 42–43.)

## II.   **Procedural History**

Powermat initiated this action on January 29, 2019 by filing a complaint.  (Doc. 1.)  The complaint was rejected by the Clerk of Court because of administrative filing errors, (*id.*), and Powermat re-filed the complaint on January 30, 2019, (Doc. 6).  Powermat asserts a single cause of action for breach of contract, and seeks both money damages and specific performance under the auditing provision of the License Agreement.  (Compl. ¶¶ 44–58.)

On March 21, 2019, Belkin filed an answer and counterclaims, asserting various affirmative defenses and counterclaims for reformation and breach of the covenant of good faith

---

[5] "Powermat Ans." refers to Plaintiff Powermat Technologies, Ltd.'s Answer to Counterclaims, filed on April 11, 2019.  (Doc. 30.)  "Powermat Mem. J. Pl." refers to Plaintiff Powermat[] Technologies, Ltd.'s Memorandum of Law Supporting its Motion for Partial Judgment on the Pleadings, filed on May 23, 2019.  (Doc. 38.)

and fair dealing.  (Doc. 28.)  Powermat filed its answer to the counterclaims on April 11, 2019.

(Doc. 30.)  The parties then proposed a joint protective order, (Doc. 31), and case management

plan, (Doc. 32), and I so-ordered the protective order on April 30, 2019, (Doc. 34).

On May 22, 2019, Powermat submitted a letter requesting leave to file a partially

redacted exhibit in support of a motion for judgment on the pleadings it intended to file, (Doc.

35), which I granted by endorsement the next day, (Doc. 36).

On May 23, 2019, Powermat filed its motion for partial judgment on the pleadings, (Doc.

37), along with a memorandum of law, declaration, and partially redacted exhibit in support,

(Docs. 38–39).  On June 20, 2019, Belkin filed a cross-motion for partial judgment on the

pleadings, (Doc. 43), along with a memorandum of law in support of the cross-motion and in

opposition to Powermat's motion, (Doc. 44).  Powermat filed its reply in further support of its

own motion on July 12, 2019.  (Doc. 47).  Belkin filed its reply in further support of its cross-

motion on August 2, 2019.  (Doc. 49.)  That same day, Belkin also filed a motion to strike a

portion of Powermat's reply brief, (Doc. 50), and a memorandum of law in support, (Doc. 51).

Powermat filed an opposition on August 9, 2019, (Doc. 52), and Belkin filed its reply on August

16, 2019, (Doc. 55).

On August 16, 2019, Powermat filed a letter requesting a Rule 16(c) initial conference,

(Doc. 53), and Belkin indicated it did not oppose, (Doc. 56).  I granted the request, (Doc. 57),

and the parties appeared for an initial pretrial conference on September 13, 2019, at which I

orally approved the parties' proposed case management plan, (*see* Doc. 62).

On November 22, 2019, the parties submitted a joint letter seeking a ruling on a

discovery dispute.  (Doc. 65.)  Powermat requested an order compelling Belkin to promptly

"produce the sales data needed to quantify its damages for Belkin's nonpayment during the full

five-year term of the contract underlying this suit," given that discovery deadlines were fast approaching.  (*Id.* at 2–4.)  Belkin objected to producing five years' worth of data given its position, set forth in full in its cross-motion for judgment on the pleadings, that the License Agreement's limitation of liability clause caps Powermat's potential damages to "the amount of royalties paid by Belkin in the 12 months immediately preceding Powermat's claim."  (*Id.* at 4.) Belkin indicated that it would produce the additional four years of unit sales data in the event that I ruled against it on the limitation of liability issue.  (*Id.*)

Belkin also requested that I order Powermat to produce certain documents in advance of scheduled depositions of Powermat executives, or in the alternative to make its 30(b)(6) witness available for a second deposition.  (*Id.* at 5.)  I held a telephone conference on December 3, 2019, at which the parties indicated that they had mostly resolved the issues in connection with the scheduled depositions.  I resolved the remaining issues by (1) stating that I would extend the discovery deadlines and (2) directing the parties to meet and confer on the length of that extension and on the unit sales data issues in light of the extensions.

On December 19, 2019, the parties submitted a letter containing alternate proposals for a revised case management plan.  (Doc. 69.)  Under Powermat's proposal, if I granted its motion, denied Belkin's cross-motion, or chose not to rule on the motions by March 1, 2020, Belkin was to produce the additional unit sales data no later than 45 days before the end of the fact discovery deadline.  (*Id.* at 1.)  Under Belkin's proposal, Belkin would produce the data only in the event that its cross-motion is denied.  (*Id.* at 2.)

On December 20, 2019, Belkin filed a motion for leave to file an amended answer and counterclaims, (Doc. 70), along with a partially redacted memorandum of law, (Doc. 72), and an exhibit in support that was filed wholly under seal, (Doc. 72-1).  Powermat submitted its

memorandum of law in opposition on January 13, 2020.  (Doc. 82).  On January 21, 2020, Belkin submitted its reply memorandum and three exhibits in support in redacted form by e-mail to my chambers, and filed a letter motion requesting permission to file these materials in redacted form on the public docket.  (Doc. 83.)

While the motion was being briefed, I issued an order that resolved several of the pending administrative issues.  (Doc. 77.)  In that order, dated January 2, 2020, I granted Powermat's request for an extension of time to file its opposition and directed Belkin to submit unredacted courtesy and electronic copies of its redacted opening brief and exhibit to my chambers.[6]  (*Id.*)  I also established a discovery schedule under which fact discovery is to conclude by April 13, 2020, and Belkin is to "produce document discovery and testimony concerning its sales data no later than 30 days before the end of the fact discovery deadline, and a witness to testify on the same matters no later than 15 days before the end of the fact-discovery deadline, unless I rule in favor of Defendant on the limitation of liability issue by March 1, 2020."  (*Id.*)  Expert discovery is set to close by July 7, 2020, and the parties are scheduled to appear for a post-discovery conference on July 24, 2020, at 11 a.m.  (*Id.*)

On January 3, 2020, the parties submitted by e-mail to my chambers a joint letter detailing a new discovery dispute and filed a redacted version of that letter on the public docket on January 7, 2020.  (*See* Docs. 78–79.)  Belkin requested an order compelling Powermat to "produce (i) documents and communications concerning Powermat's licensing disputes with third parties over the Qi standard, including Integrated Device Technology, Inc. ("IDT"), and (ii) Powermat's financial statements from 2015 through the present, as well as a knowledgeable

---

[6] Belkin complied with this request on January 9, 2020.

Rule 30(b)(6) witness to answer questions about them." (Doc. 79, at 1.) Powermat opposed this request. (*Id.* at 5–7.)

On January 14, 2020, I held a telephone conference in connection with the parties' discovery dispute. After hearing the parties' respective positions, I ordered Powermat to produce the relevant financial statements as well as documents and communications that "related to licenses that were entered into where there had been a subsequent . . . dispute with regard to those licenses and the [related] back and forth." (Doc. 86, at 13:15-23.) I reserved judgment on the issues surrounding the 30(b)(6) deposition pending the parties' submission of "the specific questions that the witness at the initial 30(b)(6) deposition had been unable to answer. (*Id.* at 6:1-13; 13:24-14:1.)

On February 25, 2020, the parties submitted two joint letters under seal detailing, respectively, two discovery disputes raised by Belkin and two discovery disputes raised by Powermat. First, Belkin seeks certain additional "documents and communications with third parties concerning royalty or IP disputes regarding the Qi Standard," that were identified by Powermat's Chief Executive Officer ("CEO") in his deposition; namely, documents concerning "efforts by Powermat to demand licenses on Qi products, and market participants refusing to pay Powermat . . . such a fee." (Belkin 2/25/20 Ltr. 3–4.) Powermat opposes on the grounds that these documents are not relevant, that Belkin previously indicated it was not seeking to discover these documents, and that complying with the request will be burdensome. (*Id.* at 5–7.) Second, Belkin seeks an order compelling Powermat's CEO to appear for a second deposition on these topics, given that Belkin had specifically reserved two hours of its time at the first deposition. (*Id.* at 5.) Powermat opposes on the grounds that Belkin already had the opportunity to depose the CEO, who is busy, that most of the relevant documents were available at the time Belkin

conducted the initial deposition, and that a second deposition would be burdensome.  (*Id.* at 7–8.)

Third, Powermat seeks an order compelling Belkin to produce "documents and testimony from

Tom Triggs, a Belkin in-house attorney, regarding his review, revisions, and understanding of

the License Agreement," because Belkin has waived attorney-client privilege by placing its own

state of mind as to interpretation of the contract at issue.  (Powermat 2/25/20 Ltr. at 1–4.)  Belkin

opposes on the ground that it has not waived the privilege and the requested documents and

testimony remain shielded.  (*Id.* at 6–8.)  Fourth, Powermat seeks an order compelling Belkin to

produce its communications with Apple concerning Qi products.  (*Id.* at 5.)  Belkin opposes on

the ground that this request is overbroad and seeks irrelevant information.  (*Id.* at 8–10.)

On February 27, 2020, Belkin requested a conference to discuss the pending motions and

to request an extension of the fact discovery period.  (Doc. 88.)  On February 28, 2020,

Powermat submitted a letter in opposition, (Doc. 89), and later that day Belkin submitted a letter

in reply, (Doc. 90.)  By endorsement dated March 2, 2020, I granted Belkin's request for a 30-

day extension of the fact discovery period and informed the parties that I would notify them "if

and when a conference is to be scheduled."  (Doc. 91.)

## III.  <u>Legal Standards</u>

### A.  *Rule 15(a)(2) Motion to for Leave to Amend Pleading*

Under Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to

amend a pleading] when justice so requires."  But "[a] district court has discretion

to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the

opposing party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing

*Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### B.  *Rule 12(c) Motions for Judgment on the Pleadings*

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  In deciding a motion for judgment on the pleadings, a district court must "employ the same standard applicable to Rule 12(b)(6) motions to dismiss, accepting all factual allegations in the [moving party's pleading] as true and drawing all reasonable inferences in the nonmoving party's favor."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015) (internal quotation marks omitted).  Therefore, to survive a motion pursuant to Rule 12(c), a complaint or counterclaim must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  Under Rule 12(c), a party is entitled to judgment on the pleadings "only if it has established that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law."  *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990) (internal quotation marks omitted); *see Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988) (noting that judgment on the pleadings "is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings").

On a Rule 12(c) motion, "the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case."  *L-7 Designs*, 647 F.3d at 422 (internal quotation marks omitted).  The complaint is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint."  *Id.* (internal quotation marks omitted).

11

IV.    **Discussion**[7]

I address the motions before me in the following order:  (1) Belkin's motion for leave to amend its answer and counterclaims; (2) Powermat's motion for partial judgment on the pleadings; (3) Belkin's motion to strike; (4) Belkin's cross-motion for partial judgment on the pleadings; and (5) the parties' discovery disputes.  I note that in assessing the merits of each party's motion for judgment on the pleadings, I confine my analysis to (1) facts alleged in the pleadings, accepting only those alleged by the nonmoving party as true, and (2) the text of the License Agreement because it is "integral" to Powermat's claims and Belkin's counterclaims and affirmative defenses.  *L-7 Designs*, 647 F.3d at 422; *see also* Verzani v. Costco Wholesale Corp., 641 F.Supp.2d 291, 297–98 (S.D.N.Y.2009) ("[W]here the claim is for breach of contract, the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiffs' claim.")  I do not consider any other matters or statements, including but not limited to the documents submitted by Belkin in support of its motion for leave to amend its answer and counterclaims, (*see* Kline Decl.; *id.* Exs. 1–5), and the purported facts recounted by Powermat in its memorandum in opposition to that motion, (*see* Powermat Opp. Am. 2–4).[8]

### A.  *Belkin's Motion for Leave to File an Amended Answer and Counterclaims*

Courts have "a variety of ways" to deal with the situation in which a motion for leave to file an amended pleading is filed while a Rule 12 motion is pending, from accepting the pleading and "denying the motion as moot" to "considering the merits of the motion in light of the

---

[7] This is a diversity action for breach of contract.  (*See* Compl. ¶¶ 1–4.)  The contract at issue, the License Agreement, contains a New York choice of law clause.  (Lic. Agmt. ¶ 14.3.)  The parties do not dispute that New York law applies, and both cite only New York law in their briefs.  Accordingly, I apply New York law to this dispute.

[8] "Powermat Opp. Am." refers to Powermat's Opposition to Belkin's Motion for Leave to File an Amended Answer and Counterclaims, filed on January 13, 2020.  (Doc. 82.)

amended [pleading]." *Conforti v. Sunbelt Rentals, Inc.*, 201 F. Supp. 3d 278, 291 (E.D.N.Y. 2016) (internal quotation marks omitted); *see also Restis v. Am. Coal. Against Nuclear Iran, Inc.*, No. 13 Civ. 5032(ER), 2014 WL 5041325, at *2 (S.D.N.Y. Sept. 30, 2014) (granting leave to file amended complaint alleging additional facts, not claims, while motion to dismiss was pending and informing the parties that the Court would treat the motion to dismiss as a motion to dismiss the second amended complaint); *Bissinger v. City of New York*, Nos. 06 Civ. 2325(WHP), 06 Civ. 2326(WHP), 2007 WL 2826756, at *1 (S.D.N.Y. Sept. 24, 2007) (granting leave to amend complaints and treating pending motion to dismiss as directed to the proposed amended complaints).

Here, Belkin does not seek to add any new affirmative defenses or counterclaims, but does seek to add additional factual allegations primarily related to its counterclaim of reformation and defense of mutual mistake.  (*See generally* Belkin Am. Ans.)  Powermat opposes only on the ground that that Belkin's amendment would be futile, (Powermat Opp. Am. 4), but it does not claim "bad faith, undue delay, or undue prejudice," *McCarthy*, 482 F.3d at 200.  Any such arguments would likely fail since the additional factual allegations Belkin includes in its proposed Amended Answer and Counterclaims appear to come from depositions taken recently, in December of 2019, (Kline Decl. ¶¶ 2, 3; *id.* Exs. 1, 2),[9] indicating a lack of bad faith or undue delay.  In addition, Powermat will not be prejudiced given that it has had adequate opportunity in its opposition to address the merits of the proposed Amended Answer and Counterclaims, and given that discovery remains ongoing.  Indeed, in its opposition, Powermat addresses the new allegations and affirms its belief that "Belkin's new allegations do not change

---

[9] "Kline Decl." refers to the Declaration of Matt Kline in Support of Belkin's Reply Memorandum of Law in Support of its Motion for Leave to file an Amended Answer and Counterclaims, filed under seal on January 21, 2020.

the outcome" of its motion for partial judgment on the pleadings.  (Powermat Opp. Am. 5.)

Accordingly, I find it in the interests of justice to grant Belkin's motion for leave to amend its answer and counterclaims, but in granting this motion am not opining on the merits or futility of the proposed amendment.  Instead, I turn next to Powermat's motion for judgment on the pleadings on its breach of contract claim and treat it as directed at the proposed amended pleading.  In assessing that motion, I consider all arguments made by the parties concerning the sufficiency of Powermat's claim and Belkin's counterclaim, whether made in connection with the motion for the judgment on the pleadings or Belkin's motion for leave to amend.

### B.  *Powermat's Motion for Judgment on the Pleadings*

Powermat seeks a judgment of liability on its breach of contract claims because (1) the License Agreement unambiguously encompasses Qi-compliant receivers in its definition of 'Licensed Products'" and (2) it is undisputed that Belkin sold devices that incorporated Qi-compliant receivers but did not pay Powermat royalties on these sales.  (Powermat Mem. J. Pl. 15.)  Powermat points to several aspects of the License Agreement supporting the interpretation it advocates here, (*id.* at 5–10), and contends that because the License Agreement is unambiguous, parol evidence may not be considered in interpreting it, (*id.* at 10.)  Powermat also argues that Belkin's defense of mutual mistake and counterclaim for reformation must fail because (1) Belkin has failed plead these claims with the particularity required by Federal Rule of Civil Procedure 9(b); (2) Belkin relies on prohibited parol evidence; (3) the License Agreement contains a disclaimer of any prior agreements; and (4) the facts alleged do not support an inference of mutual mistake.  (*Id.* at 11–15; Powermat Opp. Am. 4–10.)  Finally, Powermat argues on reply that Belkin's various affirmative defenses are legally insufficient and

unsupported by the facts alleged.  (Powermat Opp. J. Pl. 21–25.)[10]

In response, Belkin argues that Powermat's motion should be denied because it has adequately pled a fact-intensive counterclaim of reformation of contract as well as various affirmative defenses, including mutual mistake.  (Belkin Mem. Am. 6–10; Belkin Mem. J. Pl. 6–11, 18–19.)[11]  According to Belkin, the License Agreement as written does not reflect the parties' true agreement, which was the licensing of devices that used the PMA standard only, and dual-mode devices.  (Belkin Am. Ans. ¶¶ 75, 76; Belkin Mem. Am. 6–10; Belkin Mem. J. Pl. 6–11, 18–19.)   In the alternative, Belkin argues that the License Agreement is "ambiguous as to whether Qi-only receivers and transmitters are subject to royalties," and so the court must look to extrinsic evidence to interpret the License Agreement, making judgment on the pleadings alone impossible.  (Belkin Mem. J. Pl. 12–19.)

After examining the parties' allegations and arguments, I find that even if Powermat is correct that the License Agreement as written unambiguously requires payment of royalties on Qi-only devices, Belkin's counterclaim of reformation and corresponding defense of mutual mistake create significant issues of fact that bar judgment on the pleadings in favor of Powermat's breach of contract claim.  Therefore, I need not and do not reach the parties' respective arguments on the proper interpretation of the License Agreement.  *See Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 449 (E.D.N.Y. 2011) (noting that if reformation claim is granted, the breach of contract claim must be denied).  I also do not and need not reach the

---

[10]  "Powermat Opp. J. Pl." refers to Powermat's Combined (1) Memorandum Opposing Belkin's Cross-Motion for Partial Judgment on the Pleadings & (2) Reply Memorandum Supporting Powermat's Motion for Partial Judgment on the Pleadings, filed on July 12, 2019.  (Doc. 47.)

[11]  "Belkin Mem. Am." refers Belkin's Memorandum of Law in Support of its Motion for Leave to File Amended Answer and Counterclaims, filed on December 20, 2019.  (Doc. 72.)  "Belkin Mem. J. Pl." refers to Defendant Belkin International, Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Partial Judgment on the Pleading[s] and in Support of Defendant's Cross-Motion for Partial Judgment on the Pleadings, filed on June 20, 2019.  (Doc. 44.)

question of whether any of Belkin's other affirmative defenses would independently bar
judgment on the pleadings.

### 1.  Applicable Law

Under New York law, under limited circumstances a contract may be reformed "where
[the] writing does not set forth the actual agreement of the parties" as a result of "mutual mistake
or fraudulently induced unilateral mistake." *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co.
of Am.*, No. 18 Civ. 8152 (JFK), 2019 WL 5595042, at *14 (S.D.N.Y. Oct. 30, 2019) (internal
quotation marks omitted); *see also AMEX Assurance Co. v. Caripides*, 316 F.3d 154, 161 (2d
Cir. 2003).  "Reformation of contract . . . is not a matter of resolving an ambiguity in
a contract but rather of supplying what the parties clearly intended to include but inadvertently
omitted." *Citibank, N.A. v. Morgan Stanley & Co. Int'l*, PLC, 797 F. Supp. 2d 254, 264
(S.D.N.Y. 2011) ("Citibank II") (quoting *Robinson v. Metro N. Commuter R.R. Co.,* 325
F.Supp.2d 411, 412 (S.D.N.Y. 2004).  This remedy should be "sharply limited . . . both
procedurally and substantively," because it "presents the danger 'that a party, having agreed to a
written contract that turns out to be disadvantageous, will falsely claim the existence of a
different, oral contract.'"  *Collins v. Harrison-Bode*, 303 F.3d 429, 435 (2d Cir. 2002) (quoting
*Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573–74 (1986)).

Therefore, although parol and extrinsic evidence are generally admissible in reformation
actions, *Chimart,* 66 N.Y.2d at 573, the ultimate burden of proof requires that "[t]he proponent
of reformation must show in no uncertain terms not only that mistake or fraud exists, but exactly
what was really agreed upon between the parties." *Citibank, N.A. v. Morgan Stanley & Co. Int'l*,
PLC, 724 F. Supp. 2d 407, 416 (S.D.N.Y. 2010) ("Citibank I") (quoting *William P. Pahl Equip.
Corp. v. Kassis*, 588 N.Y.S.2d 8, 12 (1st Dep't 1992)).  "[M]utual mistake must exist at the time

the agreement is signed," but "the parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties." *Citibank II*, 797 F. Supp. 2d at 265 (quoting *Shults v. Geary*, 241 660 N.Y.S.2d 497, 499 (3d Dep't 1997) and *Federal Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508 (1999)), *aff'd*, 482 F. App'x 662 (2d Cir. 2012), *as amended* (Oct. 25, 2012); *see also Croce v. Kurnit*, 737 F.2d 229, 235 (2d Cir. 1984) (finding the "parties' practical construction of the contract prior to the commencement of the litigation" to be "compelling" evidence of their actual intent). "[R]eformation of a contract should be allowed only where mutual mistake or fraud is clearly established, particularly when the negotiations were conducted by sophisticated, counseled business people." *Linzer Prod. Corp. v. Sekar*, 499 F. Supp. 2d 540, 549 (S.D.N.Y. 2007) (internal quotation marks omitted).

A "general merger clause" does not preclude a reformation claim or the introduction of parol evidence to support that claim. *Barash v. Pa. Terminal Real Estate Corp.*, 26 N.Y.2d 77, 86 (1970); *cf. Citibank I*, 724 F. Supp. 2d at 417. The claim may, however, be precluded where the contract contains a "specific merger clause[]," *Barash*, 26 N.Y.2d at 86 (citing *Danann Realty Corp. v. Harris*, 5 N Y 2d 317, 320–321 (1959)), in which "the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations," *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993) (discussing rule in the context of fraudulent inducement claim);[12] *see also Dannan*, 5 N.Y.2d at 320; *Orix Credit All., Inc. v. Paul*, No. 91 CIV. 6893 (CSH), 1993 WL 78066, at *7 (S.D.N.Y. Mar. 17, 1993)

---

[12] Powermat makes several attempts to distinguish the caselaw on fraudulent inducement from the caselaw on mutual mistake by making conclusory statements; however, it cites no authority to suggest that this distinction has any legal relevance. (*See* Powermat Opp. J. Pl. 15–16; Powermat Opp. Am. 7.) The New York Court of Appeals has noted that mutual mistake and fraud are "closely related" concepts: "In a case of mutual mistake, the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement. In a case of fraud, the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement." *Chimart*, 66 N.Y.2d at 573. Therefore, even though Belkin asserts a counterclaim of reformation based on mutual mistake, I find it instructive to look to the

Finally, a reformation claim brought in federal court must be pled with particularity "in accordance with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Palmer/Kane LLC v. Rosen Book Works LLC*, 204 F. Supp. 3d 565, 581 (S.D.N.Y. 2016).

## 2.   Application

Belkin has alleged ample facts to plausibly support its claim that the inclusion of Qi-only products in the License Agreement was a mutual mistake in drafting, and that the parties' true intent was to contract for the licensing of and payment of royalties on PMA-enabled products only.

First, Belkin has alleged specific facts showing each parties' state of mind during the time leading up to and surrounding the execution of the License Agreement.  Belkin has alleged that in 2013, the parties engaged in discussions about licensing PMA technology specifically, during which Powermat gave a presentation entitled "PMA update/presentation."  (Belkin Am. Ans. ¶¶ 64–66.)  According to Belkin, these discussions later fell apart.  (*Id.* ¶ 66.)  In 2015, Belkin alleges, it approached Powermat again specifically to license its PMA technology, (*id.* ¶ 67), because it believed that its deal with another company covered its licensing of Qi products, but had been told that it needed to have in place a licensing agreement from Powermat for PMA, (*id.* ¶ 69.)  In approaching Powermat, Belkin alleges, it sent an e-mail in July 2015 entitled "Belkin PMA Solutions" that referred to the relevant licensed technology as "[their] PMA Tx solution," (Belkin Am. Ans. ¶ 64).  In turn, Belkin alleges, Powermat referred to the Licensing

---

caselaw on whether particular merger clauses bar or do not bar defenses or counterclaims of fraudulent inducement, even if those precedents may not control.

Agreement internally as the "PMA licensing agreement," (*id. ¶* 68), and referred to "Belkin's imminent sale of 'PMA' Txs," (*id.* ¶ 72).  According to Belkin, Powermat believed it did not possess any "'essential' or 'blocking' patents necessary to implement the Qi standard."[13]  (*Id.* at ¶ 71).  In keeping with their respective understandings, Belkin alleges, throughout negotiations the parties referred exclusively to PMA and "dual-mode" products, and not to Qi products.  (*id.* ¶ 72).

Second, Belkin has alleged circumstances that make it reasonably plausible that "sophisticated, counseled business people" would have signed a contract that so clearly set forth a different bargain than the one they intended to make.  *See Linzer Prod. Corp.*, 499 F. Supp. 2d at 549.  Belkin alleges that it was set to launch a PMA-enabled wireless product in November 2015 and that the negotiations were therefore rushed, to the point that the final version of the License Agreement is a redlined markup, bears the label "draft" and "DBR comments to W&C draft" at the top of the first page, and has each page numbered as page "6."  (*Id.* ¶ 84; *see generally* License Agmt.)  It is also noteworthy that with the exception of the whereas clauses, the language that purportedly bring Qi-enabled devices within the ambit of the agreement appears only in an appendix of definitions.  (*See* License Agmt.; *id.* Ex. A.)

Third, Belkin has alleged sufficient "course of performance" evidence to support an inference that even following execution of the License Agreement, both parties understood it to be limited to PMA-only and dual-mode products.  *See Citibank II*, 797 F. Supp. 2d at 265.  Specifically, Belkin alleges that although it was selling both Qi-only and dual-mode devices—which Powermat knew—it began making quarterly royalty reports and payments to Powermat

---

[13] Although the License Agreement does state that "Powermat owns and has the right to license certain essential patents. . . . necessary for compliance with the PMA Specification and/or Qi Specification," (License Agmt. 1), at this stage I do not resolve any factual conflicts, but take Belkin's allegations as true and draw inferences in favor of Belkin.

only on its dual-mode wireless charging device.  (*Id.* ¶ 75.)  Belkin alleges that Powermat accepted these reports and payments for sixteen months without objection, despite knowing that Belkin was also selling Qi-only devices.  (*Id.*)  According to Belkin, it was only after certain industry changes made clear that "Qi was going to eclipse PMA as the industry standard" and Powermat's business began to struggle that it decided to implement a "new monetization strategy" to attempt to enforce its Qi patents against Belkin as well as other companies.  (*Id.* ¶¶ 78–81.)

I find that these allegations, taken as true, would adequately "show in no uncertain terms not only that [mutual] mistake . . . exists, but exactly what was really agreed upon between the parties;'" namely, that Belkin agreed to pay Powermat royalties on its sales of PMA and dual-mode devices in exchange for a license to use Powermat's corresponding patents.  *Citibank I*, 724 F. Supp. 2d at 416.

Powermat contends that Belkin's mutual mistake claim is precluded by the License Agreement's merger clause and disclaimer of any prior agreements, which reads:

> The Parties agree that the provisions of this Agreement are the entire agreement between them regarding the matters that this Agreement addresses.  The Parties also agree that any prior agreements about these same matters, whether written or oral, are superseded by this Agreement, and previous oral agreements about those matters do not have any legally binding force.

(License Agmt. § 14.5.)  Powermat contends that this language constitutes a "specific merger clause" that bars assertion of a reformation claim because the License Agreement "specifically defin[es] the royalty base" and the section 14.5 "specifically disclaim[s] prior oral agreements" about the matters addressed in the agreement.  (Powermat Opp. J. Pl. 14.)

As outlined above, specific merger clauses only preclude reformation claims "where the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations."

*Mfrs. Hanover Tr. Co*, 7 F.3d at 316; *see also Dannan*, 5 N.Y.2d at 320 (deeming merger clause specific where it stated that the contract did "not make any representations as to the physical condition, rents, leases, expenses, operation, or any other matter or thing affecting or related to the aforesaid premises, except as herein specifically set forth, and the Purchaser hereby expressly acknowledges that no such representations have been made").

Powermat's statement that the License Agreement "specifically disclaimed oral agreements about the definition of 'Licensed Products,'" is misleading since the License Agreement plainly does no such thing.  (*See* Powermat Opp. 14.)  Rather, it is quintessentially "general," broadly disclaiming prior agreements about all "matters that this Agreement addresses."  (License Agmt. § 14.5.)  The fact that that the terms used in the License Agreement are specifically defined elsewhere—as they would be in any minimally adequate contract—has nothing to do with whether the merger clause on its own is specific.  Under Powermat's theory, most general merger clauses would be deemed "specific" simply because they are included in a contract that contains specific provisions, wholly eviscerating the rule announced in *Barash*.

Notwithstanding Powermat's tortuous attempts to recast its meaning, the disclaimer clause here closely tracks the language of clauses that other courts applying New York law have held do not preclude reformation claims.  For example, in *Securitized Asset Funding, Ltd. v. Canadian Imperial Bank of Commerce*, a panel of the Appellate Division, First Department denied the plaintiff's motion for summary judgment on its breach of contract claim because the defendant's reformation counterclaim raised triable issues of fact and "[t]he fact that the [contracts] contain merger/integration and no-waiver clauses [did] not foreclose CIBC's reformation counterclaim."  90 N.Y.S.3d 27, 29 (App. Div. 2018). Although the language of the clauses was not explicitly discussed by the panel, the documents before the

motion court below show that the merger/integration clause there was strikingly similar to the instant clause.  That merger clause stated:  "This Certificate constitutes the complete agreement between the parties with respect to the subject matter hereof, supersedes any previous agreement or understanding between them relating hereto and may not be modified, altered or amended except by an agreement in writing."  *See id.*, No. 653911/2015-NY, NYSECF Docs. 36–37 (Mar. 17, 2016).

Similarly, the Second Circuit in *FIH, LLC v. Foundation Capital Partners LLC* determined that the following merger clause was general and did not bar a fraudulent inducement counterclaim:  "this Agreement constitutes the entire agreement of the Members and supersedes all prior agreements among the Members with respect to the subject matter hereof, including the Original Agreement."  920 F.3d 134, 138 (2d Cir. 2019).  The Second Circuit noted that the merger clause was similar to one found to be general in *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 195 F. Supp. 2d 551, 562 (S.D.N.Y. 2002), *aff'd in relevant part, vacated in part,* 343 F.3d 189 (2d Cir. 2003).[14]  In that case, the district court held although the fraudulent inducement claim was precluded by specific representations in the contract about the plaintiff's financial condition and operations, if the merger clause "stood alone, there would be no question that it would not by itself preclude reasonable reliance as a matter of law."  *Id.*  The Second Circuit "affirmed [in] relevant part."  *FIH, LLC*, 920 F.3d at 138 (citing *Emergent Capital*, 343 F.3d at 195).

None of the New York cases cited by Powermat compels a different conclusion.  (*See* Powermat Mem. 12–14; Powermat Opp. Am. 5–6.)  In several of the cases, the district courts

---

[14] The merger clause in *Emergent Capital* was as follows:  "This Agreement, together with the exhibits and schedules hereto and ancillary Agreements, contains the entire understanding and agreement between or among any of them, and supersedes all prior understandings or agreements between or among any of them with respect to the subject matter hereof."  195 F. Supp. 2d at 562.

rejected the defense of mutual mistake but (1) did not analyze the text of the relevant merger clause, and (2) did not base their decision solely on the presence of a merger clause, but also on a lack of factual support that failed to overcome the merger clause.  *See VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 527 (S.D.N.Y. 2013) (granting plaintiff's motion for judgment on the pleadings despite defense of mistake because "the merger integration clause is standard" and "no facts support that the Agreement reflects a mistake"); *Citibank II*, 797 F. Supp. 2d at 275 (granting summary judgment dismissing reformation claim because "the evidence simply does not support the argument that section 6(d) was merely an 'oversight' or 'scrivener's error' requiring reformation of a fully-integrated contract containing a no-reliance clause");  *K.G. Cornwall, LLC v. Beazer Homes Corp.*, No. 07 Civ. 2881(CLB), 2008 WL 563466, at *2 (S.D.N.Y. Feb. 28, 2008) (granting summary judgment that "[i]n light of the Integration Clause in the Agreement," "[t]he facts do not support a finding of mutual mistake or fraud or overreaching").  Indeed, the *Citibank* court had previously concluded at the motion to dismiss stage that the defendant had alleged sufficient facts to make it "plausible that—despite the plain terms of Section 6(d), the integration clause, and the no-reliance clause—the parties were mutually mistaken." *Citibank I*, 724 F. Supp. at 417.  Here, Belkin's allegations are extensive and are more than sufficient to state a claim of mutual mistake at this stage, even when measured against the License Agreement's general disclaimer.  *Id.*; *cf. Inv'rs Ins. Co. of Am. v. Dorinco Reinsurance Co.*, 917 F.2d 100, 105 (2d Cir. 1990) ("[T]here is a "heavy presumption" that a written agreement accurately reflects the true intention of the parties, and the evidence of mutual mistake upon which Investors relies fails to overcome this presumption of validity." (citation omitted)).

Powermat also relies on *McEachin v. Northland Group, Inc.*, in which the district court

rejected a claim of mutual mistake in part because the evidence offered was "parol evidence, barred by the terms of the integrated document."  No. 12 CIV. 3283 CM, 2012 WL 6582423, at *7–8 (S.D.N.Y. Dec. 14, 2012).  *McEachin* does not set forth the language of the merger cause, does not conduct any additional analysis, and does not mention or distinguish the extensive precedents holding that "extrinsic evidence is admissible in a reformation action even if there is no ambiguity in the contract[] and a general merger clause."  *New York First Ave. CVS, Inc. v. Wellington Tower Assocs.*, L.P., 299 A.D.2d 205, 205–06, 750 N.Y.S.2d 586, 587 (1st Dep't 2002) (citations omitted).  Because *McEachin*'s holding goes against the weight of New York caselaw, I decline to follow it.

Finally, Powermat cites *Barash* and *Brandwein v. Provident Mutual Life Insurance Co. of Philadelphia*, 3 N.Y.2d 491, 494 (1957), for the proposition that a disclaimer is only inapplicable where the party seeking reformation wishes "to add something" rather than "contradict[] an existing term," (Powermat Opp. J. Pl. 15).  This is a distinction without a difference.  Although the *Barash* and *Brandwein* courts were faced with requests to add terms that were purportedly omitted, nothing in either decision suggests that the remedy of reformation must be limited to such requests.  *See also* Restatement (Second) of Contracts § 155 cmt. a (1981) (stating that reformation may be based on "omission or erroneous reduction to writing of a term agreed upon or the inclusion of a term not agreed upon").

Accordingly, I find that Belkin has plausibly alleged a counterclaim for reformation and related affirmative defense of mutual mistake, thereby creating material issues of fact that bar judgment on the pleadings on Powermat's breach of contract claim.  *See Juster*, 901 F.2d at 269; *see also Vasquez v. Mullooly, Jeffrey, Rooney & Flynn LLP*, 16-CV-6609 (VSB), 2017 WL 4402567, at *5 (S.D.N.Y. Sept. 30, 2017) (denying judgment on the pleadings because

defendant's affirmative defense created issue of fact).  Because Belkin's counterclaim of reformation and affirmative defense of mutual mistake create issues of fact, I need not and do not consider the proper interpretation of the License Agreement or whether Belkin's other affirmative defenses would separately bar judgment on the pleadings.

### C.  *Belkin's Motion to Strike*

Belkin seeks to strike a portion of Powermat's reply in further support of its motion for partial judgment on the pleadings on the grounds that it had failed to initially move for judgment on Belkin's affirmative defenses and, on reply, improperly raised new arguments in support of dismissing those defenses.  (Belkin Mem. Strike 2–5.)[15]  In opposition, Powermat contends that it did not bear the burden of establishing the insufficiency of those defenses, and discussed them on reply only because Belkin first raised them in its opposition.  (Powermat Opp. Strike 1–3.)[16]

Because I have denied Powermat's motion for judgment on the pleadings on the basis that Belkin's reformation counterclaim and defense of mutual mistake create issues of fact, I do not reach the question of whether Belkin's other affirmative defenses are sufficient.  Accordingly, Belkin's motion to strike is denied as moot.

### D. *Belkin's Cross-Motion for Judgment on the Pleadings*

In cross-moving for judgment on the pleadings, Belkin seeks a ruling that Powermat's liability must be capped at the amount of royalties paid by Belkin in the twelve months prior to Powermat's claim, pursuant to section 13 of the License Agreement.  (Belkin Mem. J. Pl. 20.) Powermat opposes on the ground that the Limitation of Liability Clause does not apply to an

---

[15] "Belkin Mem. Strike" refers to Defendant Belkin International, Inc.'s Memorandum of Law in Support of its Motion to Strike Plaintiff's Improper Request for Judgment on Defendant's Affirmative Defenses, filed on August 2, 2019.  (Doc. 51.)

[16] "Powermat Opp. Strike" refers to Powermat's Response to Belkin's Motion to Strike Plaintiff's Improper Request for Judgment on Belkin's Affirmative Defenses, filed on August 9, 2019.  (Doc. 52.)

action to collect unpaid royalties.  (Powermat Opp. J. Pl. 2–8.)

### 1.  Applicable Law

Under New York law, "the initial interpretation of a contract is a matter of law for the court to decide."  *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (internal quotation marks omitted).  Accordingly, "[j]udgment on the pleadings is . . . appropriate in a dispute regarding a breach of contract where the primary issue is determining the parties' legal rights and obligations."  *Neopharm Ltd. v. Wyeth–Ayerst Int'l LLC*, 170 F. Supp. 3d 612, 615 (S.D.N.Y. 2016)

When interpreting an agreement, the court's "primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.  The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  *Chesapeake Energy Corp. v. Bank of N. Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks and citations omitted); *see also Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018) (courts should "strive to harmonize all of [a contract's] terms" (internal quotation marks omitted)).  "[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'"  *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Grp., Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003).  "Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided."  *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) (internal quotation marks omitted).

## 2.  Application

The Limitation of Liability Clause provides that:

> To the maximum extent permitted by law, neither party will have liability for any indirect, incidental, consequential, special or punitive damages in connection with this agreement, regardless of the theory of liability (including theories of contractual liability, tort liability, or strict liability), nor liability for lost profits, loss of business opportunity, or business interruption, even if the party from whom those damages are sought knew or should have known that those kinds of damages were possible.  <u>Notwithstanding anything to the contrary in the preceding sentence, each party's total liability under this agreement shall not exceed the total amount of fees paid by Licensee to Powermat over the twelve months immediately preceding the date or which the claim was made.</u>

(License Agmt. § 13 (underlining in original).)[17]  Having examined the License Agreement and considered the parties' arguments, I find that the Limitation of Liability clause unambiguously (1) prohibits all types of consequential and indirect damages, and (2) limits any party's liability for direct damages to "the total amount of fees Belkin paid to Powermat during the 12 months prior" to the other party's assertion of a legal claim.  (Belkin Mem. 20.)  I also find that the phrase "a legal claim" as used in the Limitation of Liability Clause includes actions to collect allegedly unpaid royalties, and Powermat's various arguments in opposition are all unavailing.

Powermat contends that section 13 is inapplicable to this action because it only sets a cap on the "amount[] recoverable by virtue of a 'claim.'"  (Powermat Opp. J. Pl. 2.)  According to Powermat, "unpaid royalties are not a "claim" under § 13, but an "underpayment" of "royalties" that must be "settled" under § 9."  (*Id.*)  Powermat goes on to identify various provisions relevant to the payment of royalties, including section 9, which sets forth an auditing and reconciliation procedure for under- and over-payments, to be conducted no more than once a year, and which

---

[17] The original text is set forth in all capital letters but is set forth here in ordinary type for ease of reading.

requires Belkin to maintain records for three years; section 5, which sets forth Belkin's general obligation to pay royalties on a quarterly basis, with interest imposed for late payments; and section 7, which obligates Belkin to provide quarterly reports on royalties accrued.  (*Id.* at 2–3 (citing License Agmt. §§ 5.1, 5.2, 7, 9).)  Powermat also points to provisions forbidding early termination of the License Agreement's five-year term and providing that the royalty terms survive termination or expiration.  (*Id.* at 5 (citing License Agmt. § 10)).

This convoluted interpretation cannot be sustained in the face of the plain language of the License Agreement.  The words "liability" and "claim" are commonly used and understood legal terms.  According to Black's Law Dictionary, "liability" is "[t]he quality, state, or condition of being legally obligated or accountable," or one's "legal responsibility to another or to society, enforceable by civil remedy or criminal punishment."  *Liability*, Black's Law Dictionary (11th ed. 2019).  The pertinent Black's Law Dictionary definitions of "claim" are "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional," and "[a] demand for money, property, or a legal remedy to which one asserts a right . . . [a]lso termed claim for relief."  *Claim*, Black's Law Dictionary (11th ed. 2019).  Therefore, the logical conclusion is that the term "claim" encompasses an action for breach of contract to collect royalties, and nothing within the four corners of the License Agreement suggests that the parties intended any other definition.  This interpretation is also supported in context by the fact that the first sentence of the Limitation of Liability Clause prohibits consequential damages pursuant to a *legal* claim, by stating that such damages are barred "regardless of the theory of liability (including theories of contractual liability, tort liability, or strict liability)."  (License Agmt. § 13.)  The word "claim" also appears in section 8, which bars Belkin from "fil[ing] a complaint or similar pleading to institute a claim . . . seeking a declaratory judgment or similar relief that any

Licensed Patent is invalid." (License Agmt. § 8.) This supports the notion that the word "claim" in the License Agreement refers to a legal claim. Powermat does not offer any alternative definitions of the word "claim" in the context of the License Agreement or more generally. Further, while section 9 provides that Powermat "may" audit Belkin's records and demand underpaid royalties discovered by that audit, it does not require that royalties "*must* be settled under § 9" such that they are excluded from the meaning of the word "claim." (*Id.* at 2).

Powermat argues that interpreting "claim" to refer to claims for royalties would render the contract's extensive royalty provisions meaningless, an outcome to be avoided. (*Id.* at 4–6 (citing, inter alia, *Aidler v. Province of Mendoza*, 890 F.3d 95, 100 (2d Cir. 2018).) In addition, according to Powermat, implementing Belkin's interpretation has the absurd result of granting Belkin "sole discretion over how much to pay Powermat or whether to pay anything at all;" Belkin could "effectively terminate at any time by stopping paying royalties, thus locking in the maximum collectible amount . . . and ensuring no more collectible royalties would accrue." (Powermat Opp. J. Pl. 5–6.)

Contrary to Powermat's argument, the relevant provisions do not conflict with each other. *Spinelli*, 903 F.3d at 200. The Second Circuit's analysis and holding in *Process America, Inc. v. Cynergy Holdings*, LLC, 839 F.3d 125 (2d Cir. 2016) are directly on point here. In that case, the plaintiff contracted with the defendant to sell defendant's card processing services to merchants, in exchange for which it "received as compensation a portion of the discount fee charged to merchants, known as 'residuals.'" *Id.* at 131. The contract contained a clause that limited defendant's liability "for damages arising from any breach of this Agreement" to an amount not to "exceed fees derived by [the defendant] during the last 4 months of this Agreement," with certain exceptions not relevant here. *Id.* at 137. It also contained a five-year non-solicitation

clause and a provision requiring defendant to continue paying residuals after termination of the contract, unless the contract had been terminated due to a breach by plaintiff.  *Id.* at 131.  The defendant later stopped paying commissions and ultimately terminated the agreement.  *Id.*  The plaintiff brought an action against the defendant, and on a pre-trial motion in limine the district court held that the damages cap did apply to the plaintiff's claim seeking the unpaid residuals. *Id.*  On appeal, the plaintiff argued, among other things, that applying the damages cap in this way rendered the contracts' provisions on post-termination residuals superfluous.  *Id.* at 132. The Second Circuit affirmed the district court's decision, stating:

> [A]s the district court observed, [the provision for post-termination residuals] says nothing about damages; it merely establishes a substantive right (to continue receiving residuals) for Process America.  There is no contradiction between the two provisions and thus no need to "harmonize" them, which, in Process America's view, would require us to simply ignore [the damages cap].  We note that the interplay between those two provisions does give Cynergy an incentive to stop paying residuals where the payments owed would exceed the damages cap. But that is the contract that the parties bargained for . . .

*Id.* at 137–38.

Here, much like in *Process America*, sections 5, 7, and 9 of the License Agreement "say[] nothing about damages."  *Id.*  Rather, as Belkin succinctly explains, those provisions "address the parties' substantive rights and obligations in the normal course of business under the contract," while section 13 "addresses damages in the event of a legal dispute between the parties."  (Belkin Reply J. Pl. 3–4.)[18]  There is thus no need to "harmonize them;" in fact, as in *Process America*, it is Powermat's interpretation that would render a portion of the contract—the Limitation of Liability clause—meaningless.  839 F.3d at 137.  To the extent that the License Agreement might have created undesirable incentives for Belkin, it is nevertheless "the contract

---

[18] "Belkin Reply J. Pl." refers to Defendant Belkin International, Inc.'s Reply Memorandum of Law in Support of its Cross-Motion for Partial Judgment on the Pleadings, filed on August 2, 2019.  (Doc. 49.)

that the parties bargained for."  *Id.*; *see also Electron Trading LLC v Morgan Stanley & Co. LLC*, No. 651370/2015, 2017 WL 1479483, at *4 (N.Y. Sup. Ct. Apr. 25, 2017) (holding that, where plaintiff contended that applying a broad limitation of liability clause would render the contract illusory, "[m]erely because Electron is able to construct a hypothetical scenario under which its damages might be de minimus, that does not make the ELA an illusory contract.  The parties operated under the relevant agreements for almost seven months prior to Morgan Stanley's alleged breach and during that time, Electron received significant monetary compensation from Morgan Stanley. The fact that Electron is now dissatisfied with the consequences of the provision's application is no reason to void the provision.) (internal citations omitted), *aff'd Electron Trading, LLC v. Morgan Stanley & Co. LLC*, 69 N.Y.S.3d 633, 635 (N.Y. App. Div. 2018) (stating that a "limitation on liability provision represents the parties' Agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor. . . .The parties may later regret their assumption of the risks of non-performance in this manner, but the courts let them lie on the bed they made." (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994))).

Plaintiff's reliance on *Muttontown Pictures v. Levine*, 370 N.Y.S.2d 62 (N.Y. App. Div. 1975) and *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 343 F. Supp. 3d 789 (N.D. Ill. 2018) is misplaced.  The court in *Muttontown Pictures* declined to adopt one party's interpretation of a contract because that interpretation would "totally nullif[y] [a] specific covenant" of the contract.[19]  370 N.Y.S.2d at 63–64.  That is not the case here.

---

[19] In *Muttontown Pictures*, the motion picture distribution agreement gave the defendant "uncontrolled discretion" to carry out its distribution and advertising in the manner it saw fit, provided that it expended no less than $200,000. 370 N.Y.S.2d at 64.  The court held that the provision granting discretion did not release the distributor from its obligation to spend the required funds.  *Id.*

*Elorac* is a decision of the Northern District of Illinois applying New York law that is non-binding and clearly distinguishable from this case. In *Elorac*, the defendant argued that the unpaid royalties plaintiff sought pursuant to a patent licensing agreement between the parties was subject to the following limitation of liability clause: "In no event shall either party be liable to the other party for loss of profits, special, indirect, incidental, punitive or consequential damages arising out of any breach of this agreement." 343 F. Supp. 3d at 799 (converted from all capitals). The court held that the clause only barred lost profits incurred as consequential damages, and did not "encompass the royalty payments which are the fruit of the Agreement," *i.e.* general damages, because the royalty provisions of the contract "are essentially meaningless if a party breaching them is not liable for . . . lost royalties[] as general damages in a breach of contract action. There would have been no point entering into such a detailed agreement if non-performance could carry no possibility of sanction." *Id.* at 803–04 (internal quotation marks omitted). *Elorac's* holding and reasoning do not compel the outcome advocated by Plaintiff for three reasons. First, the relevant language here and Elorac are materially different. The *Elorac* court's determination of whether royalty payments fell into the category of "loss of profits, special, indirect, incidental, punitive or consequential damages," within the overall context of *that* contract, is simply not relevant to my determination of whether royalty payments constitute "total liability" within the meaning of *this* contract. Second, Plaintiff agrees that royalty payments are "the fruit of the Agreement," (Powermat Opp. J. Pl. 4, 7), and so the logic of *Elorac* would dictate that they be categorized as general damages. Plaintiff provides no persuasive argument for why the term "total liability" as used in the License Agreement should not encompass general damages. Simply because general damages were not capped in the contract at issue in *Elorac* does not mean the same should be true here. Third, as a policy matter,

interpreting the limitation of liability clause to encompass unpaid royalties as damages does not leave Plaintiff without a remedy, but merely caps the amount Plaintiff may recover.  Non-performance does carry a possibility of sanction, even if limited in scope, and the *Elorac* court's concern about rendering the royalty provisions "meaningless" is unwarranted here.

Accordingly, I conclude that Belkin's cross-motion must be granted, and any damages awarded to Powermat on its breach of contract claim against Belkin, to the extent it is successful, may not exceed the fees paid by Belkin in the 12 months preceding the date on which Powermat's "claim was made."  (License Agmt. § 13.)  For that reason, Belkin shall not be required to produce the unit sales data dating back further than 12 months prior to the date Powermat made its "claim."[20]

### V.        Discovery Disputes

Because the above rulings may affect the parties' positions on their pending discovery disputes, their requests for my intervention are denied at this time.  The parties shall meet and confer and may resubmit their disputes if the issues remain unresolved, but should be mindful of Rule 3 of my Individual Rules and Practices in Civil Cases, which instructs parties to "describe their discovery disputes in a single letter, jointly composed, not to exceed five pages."

### VI.       Materials Redacted and Filed Under Seal

Because many of the materials supporting the motions disposed of here were filed under seal or in redacted form, this Opinion & Order will initially be filed under seal to allow the parties to propose redactions.  Several supporting materials submitted in redacted form or under seal were filed without prior approval, in contravention of my Individual Rules of Practice in

---

[20] I note that the parties have not raised, and therefore I have not decided, what determines when a "claim was made" within the meaning of the License Agreement.  In other words, nothing in this Opinion & Order should be taken to establish the precise date on which the liability-limitation period was triggered.

Civil Cases, including Belkin's memorandum of law in support of its motion for leave to amend, its Amended Answer and Counterclaims, its reply in further support of its motion for leave to amend, and the parties' February 25, 2020, letters detailing their present discovery disputes. Belkin has represented that these proposed redactions were made in accordance with the parties' protective order in this case.  (*See* Doc. 83.)  However, I have examined the proposed redactions and find them to be excessive and unjustified.  By May 4, 2020, the parties should submit a letter providing support for their proposed redactions to each of the above documents, or in the alternative, submit new proposed redactions and a letter in support.  All requests for redaction should be submitted in accordance with the method set forth in my Individual Rules and Practices in Civil Cases.[21]

**VII.**   <u>**Conclusion**</u>

For the foregoing reasons, Belkin's motion for leave to file an amended answer and counterclaims is GRANTED and I accept Belkin's proposed amended answer, (Doc. 72-1), as the operative pleading.  Powermat's motion for judgment on the pleadings is DENIED.  Belkin's motion to strike is DENIED as moot.  Belkin's cross-motion for judgment on the pleadings is GRANTED, and Belkin is not required to produce unit sales data dating back further than 12 months prior to Powermat's claim at issue here.  The parties' request for rulings on various discovery disputes, raised under seal, and Belkin's request for a conference, are DENIED.  The parties are directed to meet and confer on their positions in light of this Opinion & Order and resubmit any remaining disputes if necessary.

Belkin's request to file its reply in further support of its motion for leave to amend and its

---

[21] This method was updated earlier this month to accommodate electronic filing of materials under seal, so the parties should consult the most recent version of my Individual Rules for the applicable procedure.

Amended Answer and Counterclaims in redacted form is held in abeyance at this time.  By May 4, 2020, the parties shall submit (1) a letter providing support for their proposed redactions to the documents listed in Part VI, *supra*, or (2) new proposed redactions and a letter in support.

The Clerk of Court is respectfully directed to terminate the motions at 37, 43, 50, 70, 83, and 88.  The Clerk of Court shall make this Opinion & Order viewable only to Charles E. Fowler, Erik B. Fountain, Mike McKool, Jr., Nicholas M. Mathews, Rudolph Fink, IV, Kenneth Harold Frenchman, Andrew Jay Frackman, Matthew Kline, Ryan Ken Yagura, and Brad Michael Elias.

SO ORDERED.

Dated: April 2, 2020
    New York, New York

Vernon S. Broderick
United States District Judge